OPINION OF THE COURT
Richard F. Kuhnen, J.
The Department of Planning of the City of Ithaca, New York, has granted conditional approval to UFAIR Realty Corporation (a holding company of Cornell University) to subdivide 45 acres of undeveloped commercially zoned land on the west side of Route 13, south of West Clinton Street, in the City of Ithaca.
Petitioners seek under CPLR article 78 to review the action of the department and to set it aside as arbitrary, capricious, an abuse of discretion and as illegal tu. failure to comply strictly with the provisions of the State Environmental Quality Review Act (ECL art 8 [SEQR]) and the Ithaca Environmental Quality Review Ordinance (EQR). UFAIR and Cornell University (hereinafter referred to as respondents) attack the *666 standing of petitioners to bring the proceeding, claim that it is barred by the short Statute of Limitations in section 38 of the General City Law, deny that the action was arbitrary, capricious, an abuse of discretion, or illegal, and insist that the provisions of SEQR and EQR were fully complied with.
The court will initially direct its attention to the issues of petitioners’ standing inasmuch as a decision on that issue would dispose of all other issues without further analysis.
Respondents, citing Matter of Dairylea Coop. v Walkley (38 NY2d 6), say that to establish standing, petitioners must demonstrate that the action complained of will, in fact, have a harmful effect upon petitioners and that the interest asserted is within the zone of interest to be protected by the statute upon which the challenge is premised. In the case cited, the court stated (p 9): "Whether a person seeking relief is a proper party to request an adjudication is an aspect of justiciability which must be considered at the outset of any litigation. Under traditional theory a party had standing only where he established that his legal rights had been invaded (see, e.g., Tennessee Power Co. v TVA, 306 US 118). This approach, known as the 'legal interest’ test has recently been disavowed because it focuses on the issues to be litigated rather than on the party bringing suit [citing cases]. The 'zone of interest’ test was formulated to ascertain the petitioner’s status without necessarily dealing with the merits of the litigation. A petitioner need only show that the administrative action will in fact have a harmful effect on the petitioner and that the interest asserted is arguably within the zone of interest to be protected by the statute.”
Respondents point out: "Petitioners Colongeli and Gates’ primary asserted interest in the Department’s decision to approve the subdivision application is an adverse effect from increased business competition.” Both have interests in commercial enterprises near the area of the project of the type which may very well experience such competition. Such a possibility in itself is clearly insufficient to establish standing to challenge. (Matter of Paolangeli v Stevens, 19 AD2d 763; Matter of Bank v Allen, 35 AD2d 245.)
Such an interest, say respondents, is not one which the statute was designed to protect: "It is the intent of the legislature that * * * due consideration is given to preventing environmental damage.” (ECL 8-0103, subd 9; italics added.) "Petitioners Louri and Garahan * * * assert only that devel *667 opment of the proposed subdivision may result in the loss of a local business, and thereby inconvenience them.” Again this is not an environmental interest, and, in any event, it is "premature and speculative”. (Matter of Tooker v Albright, 71 Misc 2d 619, 620.)
Petitioner Hoffman is not a resident of the City of Ithaca, but the petition asserts that he is one "who frequently comes to the City of Ithaca and who is concerned with its environment”. Petitioner Eloise Stewart, according to the petition, "is a resident of the City of Ithaca and member of Ecology Action * * * deeply concerned with the environment and ecology of this area”. Both fail to allege, as respondents claim they must, that they "personally and specifically feel the impact of the agency action”. (Conservation Law Foundation of R. I. v General Servs. Admin., 427 F Supp 1369; Sierra Club v Morton, 405 US 727.) The Federal decisions are relevant as the State act (SEQR) was closely patterned upon the National Environmental Policy Act (NEPA). The two petitioners, respondents point out, fail to allege that they personally make use of the area (as in the first case cited) "or have some other direct interest in the specific area”.
Finally, Ecology Action has not alleged direct injury to itself or to its members, say respondents, and has therefore not shown the requisite standing. (United States v SCRAP, 412 US 669; Tooker v Albright, supra.)
Petitioners have attempted to answer these criticisms by filing additional affidavits, the receipt of which by the court respondents object to on the ground that the petition must stand or fall by itself, that "[petitioners seek to introduce affidavits not to supplement the petition but to supplant it”.
Even if respondents are correct in their contention that the affidavits submitted are not strictly supplementary, the petitioners will not be denied their day in court on such a technicality if in fact the petition together with the affidavits entitle them to be heard. (See Matter of Litemore Elec. Co. v Kawecki, 48 Misc 2d 347, and cases there cited.)
From the affidavits submitted, it appears that petitioner Ecology Action is an unincorporated association of residents of the Ithaca area who are dedicated to preserving and protecting the environment.. It has over 40 active members and over 100 members who are involved in at least one of its committees or projects. Many live in the City of Ithaca and several live in the immediate neighborhood of the proposed commer *668 cial development. The affiant members state that the project involves "the largest single undeveloped parcel of land in the City of Ithaca. It will generate a great amount of traffic and air pollution * * * it will make life in the City of Ithaca less pleasant, less healthful and less safe”.
In Matter of Douglaston Civic Assn. v Galvin (36 NY2d 1) the court enunciated a new and more liberal policy as to the standing of "neighborhood and civic associations” to challenge land use rulings. The court there stated, (p 7): "we believe that an appropriate representative association should have standing to assert rights of the individual members of the association where such persons may be affected by a rezoning, variance or an exception determination of a zoning board.”
We feel that the position adopted in that case is applicable to petitioners in the present case and that the allegations of the petition and affidavits meet the criteria there laid down to apply "[i]n determining whether a particular organization should have such standing”. (See, also, Dairylea Coop. v Walkley, 38 NY2d 6, supra.)
We hold accordingly that petitioners have standing to seek the relief requested.
A more serious problem however is presented by the attack in respondents’ answer on the timeliness of the challenge.
The petition states that the purpose of the proceeding is "to review a determination that a proposal by respondents Cornell University/UFAIR Development Corporation to subdivide a certain forty-five (45) acre parcel of property in the City of Ithaca would not have a significant effect on the environment”.
The notice of petition adds that a second purpose is "reversing, annulling and setting aside the approval of the City of Ithaca Department of Planning and Development of the aforesaid subdivision”.
The problem presented is that a review of the decision approving the subdivision must be "commenced within thirty days after the filing of the decision in the office of the board.” (General City Law, § 38.) Only if petitioners are entitled to a separate review of the decision of nonenvironmental effect, are they governed by the four-month provision of CPLR 217. Concededly, the petition was not brought within the 30-day limitation.
*669 A brief recital of events is helpful. The application by Cornell for permission to subdivide its property into six lots for future sale and commercial development was made early in 1978. After a number of intermediate steps, including a public hearing on March 27, 1978, it was decided by the planning board on April 11, 1978 to require an environmental assessment form (EAF) under the State Environmental Quality Review Act (SEQR). This EAF was filed on April 28, 1978. A draft environmental impact statement (draft EIS) was filed on July 26, 1978.
At a meeting of the board on September 25, 1978, it was decided to give final conditional approval to phase I of the proposed subdivision without requiring a final EIS, after a determination that the UFAIR subdivision would have no significant effect on the environment.
Final approval was given on September 25, 1978, subject to certain listed conditions to be met by the developer who was notified thereof in a letter from the board on October 17, 1978.
What petitioners are really complaining about is the approval of the subdivision without, as they claim, due compliance with and consideration of the provisions of the State and Ithaca Environmental Quality Review Acts.
The environmental impact statements which these acts require, however, are merely a preliminary step in the process of denying, approving or modifying a proposed action, to insure that environmental factors are given due consideration in arriving at the final decision.
It is the final decision which petitioners reject here and which they in fact seek to review. Such a review would permit examination of all the steps necessarily involved in the decision, including the environmental statements which petitioners attack. (Matter of Carville v Allen, 13 AD2d 866.)
We agree therefore with respondents, who state in their brief:
"The only jurisdictional basis and reason for any SEQR determination at all is the request for subdivision approval, which requires SEQR review as a condition precedent. If the SEQR determination was legally defective, or even nonexistent, it is too late to reopen the subdivision approval because the time within which to do so has expired.
"The SEQR determination, standing alone, was not determinative of the outcome of the subdivision request. It could well *670 have been denied on other than SEQR grounds. Therefore, the determination of non-significance itself could not have aggrieved the petitioners. In this sense, it was not final and could not be the basis for Article 78 review. CPLR § 7801(1).”
Petitioners do not accept the argument that the SEQR decision was merely ancillary to the planning board’s final approval of the subdivision nor that the approval was in fact "final”. They point to the fact that such approval was subject to compliance with 12 conditions attached to the October 17, 1978 letter of approval and to section 31-23(c) of the Ithaca Code which appears to permit final approval of a preliminary plat only "upon fulfillment of the requirements of these regulations and conditions, if any, of the conditional approval”.
The court interprets this code provision as governing the preliminary plat which was submitted in March, 1978, and followed by a public hearing and a draft environmental impact statement before final approval was given.
Nor, in our opinion, was the finality of the approval negatived by the conditions imposed. As respondents point out: "As long as Cornell accepts and complies with the stated conditions of the Resolution (of October 31, 1978), the City must allow the subdivision to develop as approved”. To hold otherwise would mean that respondents, after a compliance with the conditions, involving a great expenditure of time and money, would still be subject to having that approval challenged in the courts. It would also, of course, compel the court to deny the petition at this stage for lack of finality.
Petitioners challenge also the final approval of October 31, 1978 as not having been submitted to the planning board within six months after the March approval of the preliminary plat, as required by section 31.25(B) of the Ithaca Code. That section specifically gives the planning board power to grant an extension of time which it impliedly did by accepting the documents without objection and approving them. This provision, as well as the 90-day provision of section 32 of the General City Law, are, in the opinion of the court, directed at the applicant, and can be waived by the planning board if it sees fit to render an approval in spite of failure of strict compliance.
Nor does the court agree with petitioners that the SEQR and city EQR decisions are not "ancillary”. "The law consigns the environmental determination to a different entity from *671 the Planning Board”, say petitioners, without specifying what that different entity may be.
The negative EIS was made here by "the City of Ithaca Department of Planning and Development acting as Lead Agency” on September 25, 1978. That department is a creation of the planning board. (General City Law, §§ 27, 28.) The planning board is an "agency” designated by ECL 8-0103 (subd 9) and 8-0105 (subds 1-3) to make determinations under the Environmental Quality Review Act. It made that determination in the course of and incidental to its final approval of the Cornell/UFAIR plat, the action which petitioners seek here to upset.
It is the opinion of the court therefore that this proceeding is barred by the Statute of Limitations in section 38 of the General City Law. (See Cimo v State of New York, 306 NY 143.) It may be that the time period of 30 days is far too brief to prepare an adequate petition to review, in the light of the complexity of the newly enacted provisions of SEQR, but this is a matter for the Legislature.
We are loathe however to leave the matter on this point, reluctant as we are to dismiss it on a ground which does not address itself to the merits. We feel it advisable to point out that we would deny the petition even if it were not barred by the short Statute of Limitations.
In the discussion which follows, the court accepts petitioners’ contention that the provisions of the State and Ithaca Environmental Quality Review Acts were applicable to the project which was submitted to the Ithaca Planning Board for approval. Nor do respondents challenge that contention, but they insist that the applicable provisions were substantially complied with and due regard had for their intent and spirit. Respondents do question the extent of review which petitioners claim was necessary, pointing out that "[t]he October 1978 final subdivision approval was expressly limited to Phase I, and was expressly conditioned upon the subsequent review and approval of other sections of the subdivision under the laws and regulations applicable at that time”.
DECISION NOT TO REQUIRE A FINAL EIS
Both 6 NYCRR 617.8 (e) (1) and section 36.9 of the Ithaca Code provide that an agency, if it determines after a hearing or a draft EIS that an action will not have a signifi *672 cant effect on the environment, shall prepare, file and circulate a determination to that effect. The State regulation recites that in such case "no final EIS need be prepared”. The Ithaca Code recites that thereafter "the proposed action may be processed without further regard to this Chapter”.
Petitioners challenge the legality of both of these provisions on the ground that "[t]he State Environmental Quality Review Act contains no such provision” and, in fact, seems to dictate that if it is decided not to hold a hearing after the draft EIS, an EIS must be prepared and made available within 60 days (ECL 8-0109, subd 5). The statute, however, adds, "except as otherwise provided”. The commissioner has in fact provided otherwise in his regulations, under authority of ECL 8-0113 and, it would seem, wisely. In this case the planning board issued its no impact determination only after a public hearing on March 27, 1978 and after a full review of a draft EIS. There would seem to be no point therefore in still requiring a further EIS.
Respondents point out further (and we concur) that petitioners have no standing here to challenge the commissioner’s regulations indirectly without prior challenge, with the Department of Environmental Conservation a necessary party to such attack (citing State Administrative Procedure Act, § 205; CPLR § 1003; Matter of Overhill Bldg. Co. v Delany, 28 NY2d 449; Young Men's Christian Assn. v Rochester Pure Waters Dist., 37 NY2d 371; Matter of Cosgrove v Klinger, 58 AD2d 910).
Termination of the review process before affording a full "public and agency feedback to the draft EIS”, say petitioners next is illegal because it violates the intent of SEQR.
The "intent” of the Legislature is specifically enunciated in ECL 8-0103 (subds 8, 9) which provide:
"8. It is the intent of the legislature that all agencies conduct their affairs with an awareness that they are stewards of the air, water, land, and living resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations.
"9. It is the intent of the legislature that all agencies which regulate activities of individuals, corporations, and public agencies which are found to affect the quality of the environment shall regulate such activities so that due consideration is given to preventing environmental damage.”
*673 The emphasis here is clearly on an "awareness” of the agencies of the potential environmental impact of their actions. (Cf. Warm Springs Dam Task Force v Gribble, 378 F Supp 240, 244.)
Nor does the record indicate that the public has not been made fully aware of the evaluation process at every step and afforded a full opportunity to participate and criticize. As pointed out, a public hearing was held at an early stage, after due notice to the public and to the county planning department. Petitioner Daniel Hoffman of Ecology Action was present and participated at some length in the discussion which took place. The Tompkins County Planning Department made its views known by letter of March 29, 1978. On April 11, 1978 the Ithaca Director of Planning and Development requested an environmental assessment form from UFAIR which was furnished on April 28, 1978. After considerable conferences and correspondence with UFAIR, the city decided on May 19, 1978 to require a draft EIS. This was received on July 26, 1978. Comments and criticisms were received in writing on August 7, 1978 from the City of Ithaca Environmental Commission and taken into consideration. Notice of completion of the draft EIS was published on August 7, 1978 and copies sent to persons and agencies as prescribed by the regulations. Comments were received from the New York State Department of Environmental Conservation by letter of September 7, 1978. Final approval to phase I of the project was not given until October. As alleged in respondents’ answer, and as the court finds, "during the above referenced proceedings lasting at least from January, 1978, thru October 17, 1978, all relevant and material impacts were considered including Petitioners views and the determination was made pursuant to law in a proper manner and was not arbitrary or capricious”.
That petitioners were not present at the planning board meeting of October 31, 1978, when final approval was given, was their own decision. As they say in their brief, "this is because by then the aggrieved persons had pretty well decided to take the matter into court”.
ARBITRARY, CAPRICIOUS AND AN ABUSE OF DISCRETION
Petitioners charge also that "[t]he determinations complained of in this proceeding are decisions which demonstrably violate express statutory or regulatory standards describing what types of actions will usually have a significant impact on *674 the environment * * * and fall squarely within the definition of arbitrary and capricious contained in Guardian Life, supra [Guardian Life Ins. Co. v Bohlinger, 308 NY 174] and Small v Moss, supra [279 NY 288].”
The "express statutory or regulatory standards” which petitioners charge were disregarded are contained in ECL 8-0109 and section 36.7 of the Ithaca Municipal Code. Petitioners concede that:
"A cursory examination of the table of contents of the UFAIR Draft EIS reveals that it purports to address itself to each of these categories. As such, this EIS is marginally better than some which have been rejected by courts. * * *
"Although the UFAIR Draft EIS conforms to legislative and regulatory specifications at the table of contents level, examination of the body of the document reveals gross inadequacies.”
This court has no intention of examining in depth each of the challenges by petitioners to the adequacy of the 45-page draft EIS and passing judgment thereon. That is not the function of the court. We deem it sufficient to determine whether the draft EIS has addressed itself to each of the relevant factors which should be considered. As 6 NYCRR 617.14 (c) provides: "EIS’s should address in detail only those specific adverse or beneficial environmental impacts which can be reasonably anticipated. They should not contain more detail than is appropriate considering the nature and magnitude of the proposed action and the significance of its potential impacts.” (Emphasis added.) As respondents point out: "The action being approved was merely the subdivision of undeveloped land for the purpose of sale and future development.” The planning board’s concern with possible future uses was only with environmental factors — it was not passing upon, advocating, or rejecting any specific uses which might thereafter come before it.
Respondents correctly point out in their brief: "The controlling standard of review in this proceeding is whether the Department’s determinations were arbitrary and capricious. The Court of Appeals has equated this standard to rationality of the determination. Matter of Pell v Board of Education, 34 NY2d 222 (1974).”
The Court of Appeals has stated that it is "the settled rule that in reviewing board actions as to variances or special exceptions the courts do not make new or substitute judg *675 ments but restrict themselves to ascertaining whether there has been illegality, arbitrariness, or abuse of discretion * * * The courts do not sit to supervise the discretionary acts of the hundreds of town boards and town zoning boards in this State”. (Matter of Lemir Realty Corp. v Larkin, 11 NY2d 20, 24.)
The scope of review is not enlarged by the fact that an environmental decision is the subject under challenge.
As the United States District Court of North Carolina stated, in Conservation Council of N. C. v Froehlke (435 F Supp 775, 782) in a case arising under the National Environmental Protection Act, on which SEQR was modeled: "the Court is specifically not empowered to substitute its judgment for that of the agency * * * the Court is not to make the ultimate decision but only to see that the official or agency took a 'hard look’ at all relevant factors. Consequently, the power of judicial review in this area is a narrow one to be applied within reason, and in essence is confined to a determination of whether the administrative decision represented a clear error of judgment.”
Several of the criticisms aimed at the draft EIS by petitioners are without merit, as a matter of law. Although ECL 8-0109 (subd 4) states that the EIS should describe "reasonable alternatives to the action”, it was never the intention of the statute that such alternatives be based on other than environmental factors. It is not the function of SEQR or any agency in our economic system to dictate what use must be made of private property even though it may restrict usage on accepted principles. That petitioners would prefer that the property be used for a housing complex, or that the EIS should have considered such an alternative, is not a valid criticism. Respondents, in this context, cite Department of Environmental Conservation Handbook for Local Government (p 22) that "[e]ach EIS should present an analysis of reasonable alternatives to the proposed action that will achieve the same or similar objective”.
Another basis of attack by petitioners on the draft EIS is its failure to consider the economic impact of the proposed subdivision. They point to a letter of September 7, 1978 from the State Department of Environmental Conservation to the city planning department with reference to the draft EIS which suggests that "the final EIS should discuss the need for the proposed project as evidenced by market surveys or other *676 appropriate documentation”. That letter, which was written by Terence P. Curran, Director of the Office of Environmental Analysis, states: "The Department of Environmental Conservation has reviewed the subject environmental impact statement (EIS). In general the statement adequately addresses the potential significant environmental impacts associated with the proposed project. Also this Department finds the scope of the draft EIS to be commensurate with the scope of the project planned.”
The court is in full agreement with this analysis of the draft EIS by one presumably better qualified as an expert in the field. However, insofar as the letter suggests that the city planning department should consider the "need” for the project based upon "market surveys”, we must point out that no such requirement is contained in SEQR or EQR or in the State or city regulations. Socio-economic considerations are to be considered (ECL 8-0103, subd 7), but the primary concern is environmental, and whether there is "need” for a proposed project in the sense of restraining competition as one of the purposes of SEQR is nowhere indicated, even if that could be a legal objective, which the court doubts.
The court has a distinct impression that the primary objections of some of petitioners is fear of economic competition. Commenting on such objections, in a case under the National Environmental Protection Act, the District Court stated (National Assn. of Govt. Employees v Rumsfeld, 413 F Supp 1224, 1229):
"Plaintiffs attack these conclusions arguing that the assessments should have and did not include considerations of socioeconomic factors. Plaintiffs’ primary concerns are economic; to wit, the increased unemployment in the Pueblo, Colorado area as a result of job losses at PUAD, and the resultant negative effect on the economy as a whole in the community.
"Such considerations, however, are not the primary concern of NEPA. The primary concern is the physical environmental resources of the nation.”
We are satisfied from the above discussion that respondents have attempted in good faith to comply with the requirements of SEQR and EQR and to afford the public full opportunity to be heard; that the decision not to require a final EIS was not arbitrary or capricious; nor was the declaration of no environmental impact; that the criticism and objections offered by those who chose to comment were given due consideration and *677 those deemed worthy of acceptance were included in the conditions imposed upon the approval of phase I of the project.
The petition is denied on the ground that it is barred by the 30-day limitation of section 38 of the General City Law, but, as discussed above, we would have denied even if this were not the case.