OPINION OF THE COURT
David O. Boehm, J.
In these separate proceedings, which request declaratory judgment and CPLR article 78 relief, the petitioners-plaintiffs seek to invalidate rezoning by the Webster Town Board on December 27, 1979 which created a PCS (Planned Shopping Commercial District) within an existing CS (Commercial Shopping Center District). The subject property, which is owned by some of the respondents-defendants* is located at the intersection of Ridge and Holt Roads in the Town of Webster, New York. Respondents Homart Development Co. and Leonard Dobbs are the developers of the proposed enclosed shopping center to be built on this site (hereinafter the Homart site).
The petitioners are primarily resident homeowners living adjacent to or very near the Homart site. Hegedorn Holdings, *855 Inc., is the owner and operator of a large food market on Ridge Road less than one-half mile from the Homart site and also owns or controls approximately 100 acres at the same location. This property has been optioned to National Shopping Centers, Inc., which apparently intends to develop it into an enclosed shopping center and mall, depending, no doubt, upon the ultimate outcome of these proceedings.
These various actions are grounded upon the claim that the town board, in its haste to grant the rezoning before the end of the year 1979 and the expiration of its members’ terms, failed to comply with the procedures mandated for a project of this kind by the State Environmental Quality Review Act (hereinafter SEQRA) (ECL art 8) and the regulations promulgated thereunder (6 NYCRR 617.1 et seq.); further, that the General Municipal Law, the Public Officers Law and the Webster Town Code were also violated.
These actions are now before the court on motions brought by all of the parties except the town board and the Town of Webster, as follows:
1. Petitioners move to consolidate the article 78 proceedings and the declaratory judgment actions and request a preliminary injunction in the declaratory judgment actions;
2. Respondents move to dismiss the article 78 proceedings and for summary judgment in the declaratory judgment actions;
3. Petitioners cross-move for summary judgment in their declaratory judgment actions and for judgment pursuant to CPLR 7804 in the article 78 proceedings.
FACTS
On October 22, 1979, Homart and Dobbs announced their intention to seek a change of zoning from CS to PCS on the subject site to enable them to build an enclosed regional shopping center and mall. This application was made in accordance with the Webster Town Code Planned Unit Development District Provisions (Webster Town Code, § 59-21 et seq.). As planned, the mall would occupy approximately 93 acres of land and would contain four major stores and more than 120 smaller stores. It would consist of over 900,000 square feet of buildings and approximately 4,600 parking spaces. The developers also submitted an environmental assessment form (hereinafter EAF) to the town board. This *856 form, which is required by the SEQRA regulations (6 NYCRR 617.6 [b], 617.3 [d]), is submitted by land developers to assist the agency in charge of approving such proposals to determine their environmental significance. The EAF is required to contain enough information to describe the proposed action, its location, its purpose and its potential impact on the environment (6 NYCRR 617.2 [k]).
On November 1, 1979 the town board, based upon the information supplied in the Homart EAF, determined that the proposed rezoning and development was a "Type I” action as defined in the SEQRA regulations (6 NYCRR 617.12).
On the same date, the town board found that the project would have a significant effect on the environment (for SEQRA purposes, this is a "positive declaration” and will be referred to as such hereinafter). This finding was consistent with the criteria set forth in 6 NYCRR 617.11 for determining the significance of Type I actions, which include substantial adverse changes in existing air quality, water quality and noise levels, a substantial increase in solid waste production (6 NYCRR 617.11 [a] [1]), the attractions of a large number of people for more than a few days who would not otherwise be at that location (6 NYCRR 617.11 [a] [3]), a major change in the use of energy (6 NYCRR 617.11 [a] [6]), and a substantial change in the use and intensity of use of the land (6 NYCRR 617.11 [a] [8]). At the same time, the town board declared itself the "lead agency” for SEQRA purposes (6 NYCRR 617.6 [c]) and, by so doing, assumed responsibility for administration of the SEQRA process under the legislative scheme. Lastly, because of the positive declaration, the town board in its capacity as lead agency, directed that a draft environmental impact statement (hereinafter DEIS) would be required. The DEIS, the second-level requirement of the SEQRA process, is designed to "relate environmental considerations to the inception of the planning process, to inform the public and other public agencies * * * about proposed actions that may significantly affect the quality of the environment, and to solicit comments which will assist the agency * * * in determining the environmental consequences of the proposed action.” (ECL 8-0109, subd 4.)
On November 7, 1979, after a town board election which saw the incumbents losing their political majority, Homart and Dobbs formally commenced the process required for obtaining rezoning.
*857 In addition to submitting sketch plans to the planning board, the developers, on November 16, 1979, delivered a lengthy DEIS to the town offices. This having been done, the town board, as lead agency, was legally required to meet and to review the DEIS to determine whether to accept it as satisfactory with respect to scope, contents and adequacy (ECL 8-0109, subd 5; 6 NYCRR 617.8 [b]). However, it is conceded by the town board in its answer that it did no such thing. In addition, the town board, although filing notices of completion of the DEIS with involved governmental agencies as required by SEQRA (ECL 8-0109, subd 4; 6 NYCRR 617.10 [d]), failed to file copies with the State and Federal clearinghouses, as is also required (6 NYCRR 617.10 [d]).
On November 21, 1979, the town board published a notice in the Webster Herald, a local newspaper, which stated that the DEIS was on file and advised that public comment on the DEIS would be accepted until December 17, 1979, the 30-day minimum required by the regulations if no public hearing is held (6 NYCRR 617.10 [d] [3]).
The town board met the same week, on Friday, November 23, 1979, and scheduled two public hearings for December 13, 1979 — one for the purpose of determining, under the zoning ordinance, its "intention to rezone” the Homart site, and the other for receiving public comments on the DEIS. A notice of these hearings was also published in the Webster Herald.
On December 13, 1979, the town board convened before over 250 spectators. Before commencing the formal hearing on the DEIS, the board completed the rezoning hearing and passed a resolution of "intention to rezone” the Homart site to PCS, without conditions or restrictions. Immediately thereafter, the board held the DEIS hearing. There was considerable criticism directed against the town board because of what appeared to be a rush to rezone before the end of the year. There was also comment criticizing the nature of the treatment of items required for a DEIS. The Department of Environmental Conservation (hereinafter DEC) objected to the timetable being imposed by the board and requested an extension of at least two weeks for public comment. This extension was denied but the board passed a resolution, in apparent compliance with the alternative public comment provision of 10 days after a DEIS public hearing (6 NYCRR 617.10 [d] [3]), extending the comment period 10 days to December 23, 1979, a Sunday two days before Christmas.
*858 During the next 10 days the board received more criticism and suggestions. The DEC submitted a list of comments and recommended that the DEIS be substantially revised or redone and the Monroe County Environmental Management Council and the town’s own Commissioner of Public Works wrote in similar fashion.
On December 21, 1979, the outgoing supervisor sent a memo to the board members calling a private, unannounced meeting for December 26, 1979, the evening before the last scheduled town board meeting of the year. At this meeting, the board members received a 112-page document supplementing the DEIS. This supplement was prepared by the developers’ engineers in response to the comments voiced at the public hearing and to those areas of concern expressed by the governmental agencies regarding the DEIS. It was never made public.
The regularly scheduled meeting on December 27, 1979 was heavily attended. After some discussion on other matters, the supervisor read a prepared statement declaring that the proposed development and rezoning would not have a significant effect upon the environment (in SEQRA parlance, a "negative declaration”) and that "therefore, no final Environmental Impact Statement (EIS) need be prepared or submitted.” Having so decided, the town board was required to file its negative declaration with the required agencies pursuant to 6 NYCRR 617.3 (a). Concededly, it did not do so; instead, overruling requests for discussion, the board proceeded to pass separate motions to dispense with the EIS and to rezone the subject site to PCS.
STANDING
Respondents’ principal argument for dismissal is that the petitioners lack standing, especially because they are primarily motivated by economic considerations.
Here, the petitions and complaints demonstrate that the petitioners and their properties, all located within the Town of Webster, will suffer detrimental environmental impacts. Given the stated purpose of SEQRA to insure that "due consideration is given to preventing environmental damage” (ECL 8-0103, subd 9), it is clear that the interests of the petitioners fall within the zone of interest protected by the statutes involved (Ecology Action v Van Cort, 99 Misc 2d 664, 666-668; Matter of New York State Bldrs. Assn. v State of New York, 98 Misc 2d 1045, 1049-1050). This conclusion is equally appli *859 cable to Hegedorn’s Holdings, Inc., notwithstanding the former’s large economic interest in the outcome. Hegedorn’s Holdings, as a landowner and local business, will be affected by the environmental consequences of the proposed development to the same extent as the other petitioners. Under the Federal National Environmental Policy Act (NEPA), "[individuals motivated in part by protection of their own pecuniary interest can challenge administrative action * * * provided that their environmental concerns are not so insignificant that they ought to be disregarded altogether” (Robinson v Knebel, 550 F2d 422, 425). There is no reason why the same should not be true under SEQRA. In light of the fact that "[a]nyone who can show an adverse environmental impact causing him or her injury as a result of agency action [has] standing to bring an action” (Matter of New York State Bldrs. Assn. v State of New York, supra, p 1050), the mere fact that Hegedorn’s Holdings has concerns unrelated to the environmental effects of the proposed development is not enough, in and of itself, to deny standing where it can show the same probability of environmental damage as have the other petitioners.
I find, therefore, that the petitioners have standing to maintain these proceedings.
PROPRIETY OF PETITIONERS’ ARTICLE 78 PROCEEDINGS; petitioners’ motions to consolidate.
The respondents challenge the petitioners’ right to seek relief by way of article 78, on the ground that the relief being sought is annulment of the declaration of intent to rezone. This argument is based on Todd Mart v Town Bd. of Town of Webster (49 AD2d 12), in which the Fourth Department held that declarations of intent to rezone are legislative acts, reviewable in declaratory judgment actions rather than by article 78 proceedings. Unlike Todd Mart, however, this case involves the town board’s actions in two capacities. Todd Mart involved rezoning alone, which is clearly a legislative function. Here, in contrast, the board was legislating in the zoning process and was also, as lead agency, serving as an administrative agency for purposes of determining SEQRA compliance.
In Todd Mart, the Fourth Department found it unnecessary to choose one form over the other, reasoning that the court has the inherent power to convert declaratory judgment ac *860 tians into article 78 proceedings, and vice versa, under CPLR 103 (subd [c]) (supra, p 17; see, also, Matter of Lakeland Water Dist. v Onondaga County Water Auth., 24 NY2d 400).
Here, in light of the fact that common questions of law and fact are involved, the petitioners have a clear right to consolidation. By consolidating the actions and proceedings, the relief requested by the parties can be considered within the consolidated actions according to the standards applicable to the acts of the town board in each of its capacities.
Accordingly, petitioners’ motions to consolidate are granted and respondents’ motions to dismiss on this ground are denied.
petitioners’ and respondents’ motions for summary JUDGMENT
I. Issuance of the Negative Declaration
The principal thrust of the petitioners’ motions is directed at the issuance of the negative declaration on December 27, 1979. Simply put, the petitioners claim that the town board could not, as a matter of law, find that a project of this magnitude would not have a significant effect upon the environment.
The SEQRA legislation, in delegating authority to the Commissioner of Environmental Conservation for the promulgation of regulatory guidelines, required that a regulation specifying criteria for determinations of significance ("positive declarations”) be adopted (ECL 8-0113, subd 2, par [b]). To this end, the DEC designated certain actions as "Type I” actions which are, by definition, "more likely to require the preparation of EIS’s than those not so listed” (6 NYCRR 617.12 [a]). The petitioners contend, and the town and the developers concede, that the proposed development of the Homart site is a "Type I” action, in that it meets or exceeds many of the specified criteria for types of actions which qualify for "Type I” treatment.
In addition to designating certain actions as "Type I” actions, the DEC also adopted criteria for determining whether proposed "Type I” actions will have a significant effect upon the environment (6 NYCRR 617.11). The petitioners, the town and the developers all agree that the proposed development meets or exceeds some or all of these criteria.
Having initially determined that development of the Ho- *861 mart site was a "Type I” action and that it might have a significant effect upon the environment, the town board properly required preparation of the DEIS. Thus, the focus of this controversy is not whether the initial determination was correct but, rather, whether the town board acted within its discretion as lead agency in dispensing with the requirement of a final environmental impact statement after submission of the DEIS and receipt of public comments thereon on December 27, 1979.
The environmental impact statement is the final step in the SEQRA scheme. It is a "detailed statement” setting forth, among other things, the long and short term environmental impacts of the proposed action, the unavoidable adverse environmental effects, the alternatives to the action, any irreversible or irretrievable commitments of resources which would be involved in the project, the mitigative measures proposed to minimize the environmental impacts, and the growth-inducing aspects of the action (ECL 8-0109, subd 2, pars [a]-[i]). More importantly, perhaps, the EIS must include copies or a summary of the substantive comments on the DEIS received by the agency and the agency response to these comments (ECL 8-0109, subd 2; 6 NYCRR 617.14 [f] [11]).
Thus, after focusing public attention and comments upon the environmental considerations of a proposed action through the DEIS, SEQRA insures that the agency consider and respond to these inputs by specifying the content of the final EIS. To further guarantee this obligation, SEQRA requires that the EIS be filed in a number of locations and that the public be allowed 10 days to study it before the agency is permitted to take the proposed action (ECL 8-0109, subd 6; 6 NYCRR 617.9 [a]). Finally, and more importantly, SEQRA expressly prohibits agency approval of an action until it has considered the EIS and made written findings that SEQRA requirements have been met and "that consistent with social, economic and other essential considerations, to the maximum extent practicable, adverse environmental effects revealed in the environmental impact statement process will be minimized or avoided.” (ECL 8-0109, subd 8; 6 NYCRR 617.9 [c] [2] [i], [ii].)
The Webster Town Board did not undertake any of the steps required by SEQRA beyond requiring preparation of the DEIS and holding the public hearing thereon. While an EIS need not always be submitted after the receipt of the DEIS if the *862 lead agency properly determines that a proposed action will not have a significant effect on the environment (6 NYCRR 617.8 [e] [i]), application of the criteria for determining environmental significance of "Type I” actions to the plans for development of the Homart site show, beyond peradventure, that this project may clearly have a significant effect upon the environment and that an EIS should have been required.
The leading New York case on the point is H.O.M.E.S. v New York State Urban Dev. Corp. (69 AD2d 222), in which the Fourth Department held, as a matter of law, that Syracuse University’s $41,000,000 reconstruction of its domed arena could not be approved prior to submission of an EIS. The Urban Development Corporation, the agency in charge of development of the dome, approved the project in the face of massive traffic problems which would inevitably ensue. Finding that the two-month processing of the environmental portion of the proposal was accomplished with "miraculous speed”, the court stated (p 232): "To support UDC’s determination, the record must show that it identified the relevant areas of environmental concern, took a 'hard look’ at them * * * and made a 'reasoned elaboration’ of the basis for its determination * * * In a case of this sort, 'there is a relatively low threshold for impact statements’ * * * and 'such a statement should be required where the action may fairly be said to have a potentially significant adverse effect’ ”. (See, also, Matter of Tuxedo Conservation & Taxpayers Assn. v Town Bd. of Town of Tuxedo, 69 AD2d 320.)
Under the much less demanding Federal law, Federal courts have long recognized the necessity for a final environmental impact statement in connection with the total environmental qualification process. For example, in Silva v Lynn (482 F2d 1282, 1284-1285) a case in which a final statement was prepared but was found to be inadequate, the court observed that the final statement serves three purposes: "First, it permits the court to ascertain whether the agency has made a good faith effort to take into account the values NEPA seeks to safeguard. To that end it must 'explicate fully its course of inquiry, its analysis and its reasoning.’ Second, it serves as an environmental full disclosure law, providing information which Congress thought the public should have concerning the particular environmental costs involved in a project * * * It cannot be composed of statements 'too vague, too general and too conclusory.’ * * * Finally, and perhaps most substantively, *863 the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. A conclusory statement 'unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind’ not only fails to crystallize issues * * * but 'affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives.’ Monroe County Conservation Council v. Volpe, 472 F.2d 693, 697 (2d Cir. 1972). Moreover, where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. There must be good faith, reasoned analysis in response.” (See, also, City of Rochester v United States Postal Serv., 541 F2d 967; Chelsea Neighborhood Assns. v United States Postal Serv., 516 F2d 378; Maryland Nat. Capital Park & Planning Comm. v United States Postal Serv., 487 F2d 1029; Morgan v United States Postal Serv., 405 F Supp 413.)
The courts of some States have held to the same effect. Thus, in No Oil v City of Los Angeles (13 Cal 3d 68) the California Supreme Court, in dealing with the requirements of the California Environmental Quality Review Act (CEQRA), which is very similar to SEQRA in design and intent, held that a municipal board’s determination that establishment of drilling well districts in a residential area would not have a significant effect upon the environment was erroneous as a matter of law, and the agency involved could not, accordingly, dispense with the requirement of an EIS. The court noted (p 85): "[A]n agency should prepare an EIR [the California equivalent of an EIS] whenever it perceives 'some substantial evidence that the "project may have a significant effect” * * *’ * * * As stated by Judge J. Skelly Wright in Students Challenging Reg. Agency Pro. v. United States (D.D.C. 1972) 346 F.Supp 189, 201, an environmental impact report should be prepared 'whenever the action arguably will have an adverse environmental impact.’ ”
Massachusetts and the State of Washington have also adopted low threshold standards for assessing the need for a final EIS. In Secretary of Environmental Affairs v Massachusetts Port Auth. (366 Mass 755, 768-769), the Massachusetts Supreme Court ruled that an EIS is required whenever there *864 is a potential for damage to the environment which may be characterized as "not insignificant”. To the same effect, in Norway Hill Preservation & Protection Assn. v King City Council (87 Wn 2d 267, 278), the Washington Supreme Court held that full environmental procedures should be followed "whenever more than a moderate effect on the quality of the environment is a reasonable possibility”.
The EIS requirement is the only step in the SEQRA scheme which gives SEQRA its "teeth”, in that the scheme requires a specific finding by the lead agency that the adverse environmental effects of the proposed action have been minimized or avoided to the maximum extent practicable (6 NYCRR 617.9 [c] [2] [i]) or that the adverse environmental effects will be minimized or avoided by incorporating as conditions to the decision those mitigative measures which were identified in the EIS as practicable (6 NYCRR 617.9 [c] [2] [ii]). The significance of the EIS in the over-all SEQRA scheme is perhaps most graphically illustrated by the fact that a DEIS, whatever its content, has no binding effect, as its very purpose can be terminated by the issuance of a negative declaration. Thus, in the absence of a final EIS and the concomitant obligations it imposes on the lead agency, the environmental qualification process is nothing more than an administrative ritual.
In its answering affidavit, the town concedes that it did not take a "hard look” at those areas of environmental concern identified in the DEIS. Even without this concession, it is clear that the negative declaration was, by any standard, clearly without support from the record before the board. Given the relatively low threshold requirements for determining the significance of projects such as this one, it is inconceivable that the negative declaration on these facts could be in harmony with the stated purpose of SEQRA that protection and enhancement of the environment be given appropriate weight in the decision-making process (ECL 8-0101; 6 NYCRR 617.1; H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d 222, supra).
Accordingly, the petitioners are correct in urging that, under the circumstances, the town board, as a matter of law, could not dispense with the requirement of an EIS. Where, as here, the information supplied in a DEIS clearly shows that the action proposed meets the SEQRA criteria for determining the significance of "Type I” actions set forth in 6 NYCRR 617.11, the lead agency must continue the SEQRA process and *865 require an EIS. Any other conclusion would clearly frustrate the purpose of the SEQRA scheme to require an EIS whenever a proposed action may have a significant effect upon the environment (ECL 8-0109, subd 2; H.O.M.E.S. v New York State Urban Dev. Corp., supra, p 232). As observed by the California Supreme Court as early as 1975 in Bozung v Local Agency Formation Comm. of Ventura County (13 Cal 3d 263, 283): "The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind.” On remand, the town board is directed to complete the SEQRA process, as required by ECL article 8 and the SEQRA regulations.
II. The December 13, 1979 Declaration of Intent to Rezone and the December 27, 1979 Rezoning
A. The other points of petitioners’ motions involve the town board’s passage of the declaration of intent to rezone on December 13, 1979, and the rezoning itself on December 27, 1979. It is here that the interplay between the board’s function as the lead agency for SEQRA purposes and its role as a legislative body for zoning purposes becomes most apparent.
The Webster Zoning Ordinance provides that the town board "shall” enact rezoning legislation after passage of a declaration of intent to rezone and compliance by the developer with the conditions contained therein (Webster Town Code, § 59-27). Thus, in a case such as this, the mandatory language of section 59-27 renders the rezoning itself a purely ministerial act, as no conditions or limitations were placed on the rezoning by either the town board or the planning board. Further, the SEQRA statute expressly excludes from the definition of actions "official acts of a ministerial nature, involving no exercise of discretion” (ECL 8-0105, subd 5, par [ii]). Taken together, therefore, the Webster Zoning Ordinance and SEQRA make the declaration of intent to rezone the point in the rezoning process at which the town board must, as lead agency, have the SEQRA process completed.
As discussed earlier, the town board could not dispense with the requirement of an EIS. Therefore, in light of the fact that the SEQRA process must be completed before passage of the declaration of intent, passage on December 13, 1979 without, or prior to, submission of an EIS was in direct contravention of the SEQRA requirements. For this reason alone, it was invalid.
Moreover, assuming arguendo that an EIS was not neces *866 sary, enactment of the declaration of intent prior to issuance and filing of a negative declaration was premature, as these are necessary predicates to completion of the SEQRA process where no EIS is necessary (6 NYCRR 617.10 [b], 617.3).
Accordingly, on remand, the town board must not only complete the SEQRA process in conformance with the prior discussion, but it must also do so prior to consideration of a declaration of intent to rezone, or again run the risk of invalidation of its actions.
B. The other arguments raised with respect to the declaration of intent to rezone concern compliance with section 239-m of the General Municipal Law and section 59-26(D) of the Webster Town Code.
Section 239-m of the General Municipal Law requires a vote of a majority plus one of all of the members of the town board and a resolution setting forth specific reasons where a town board chooses to override recommended modifications of a proposal submitted by the county planning commission.
In a report filed with the town board on December 13, 1979, the Monroe County Planning Commission made certain recommendations, but nonetheless, in adopting the resolutions of intent to rezone and rezoning, the town board did not state the reasons for its failure to incorporate these recommendations, as required. In addition, the vote at the December 13, 1979 meeting was itself invalid to override the recommendations, as only four of the five members were present. While the vote on the resolution of intent to rezone was four to one, the absent member’s vote in favor of passage was cast by proxy, which is impermissible absent special legislation (see, e.g., Town Law, § 63; 1963 Opns Atty Gen [Inf Opns 207]). Thus, the vote was not effective and, for this reason, passage of the resolution of intent to rezone was invalid.
The petitioners next argue that the resolution of intent to rezone and the rezoning violated sections 59-26(D) and 59-27(A) of the Webster Town Code which deal with declarations of intent to rezone by the town board and approval of final development plans by the planning board. These ordinances require, as conditions precedent, that there be affirmative proof of compliance with all State laws, rules and regulations.
In this connection, it should be noted that the Commissioner of Environmental Conservation, pursuant to his authority under title 3 of article 19 of the Environmental Conservation Law, has formulated regulations requiring developers to oh *867 tain an Air Resources Indirect Source Permit prior to commencement of construction where modification of an existing section of a road or highway within an urban area may increase the annual average of daily traffic volume by more than 10,000 vehicles within 10 years of completion of the modifications (6 NYCRR 203.3 [3] [ii]). The regulations further designate all of Monroe County to be an urban area (6 NYCRR 203.2 [e] [7]).
The DEIS filed by the developers identified needed modifications to State Route 104, and indicated that the modifications could substantially increase traffic going to and from the Homart site. On the basis of the information contained in the DEIS, the DEC notified the town board that it was unable to determine whether an Air Resouces Permit would be required and requested further information. In point of fact, the DEC has still not arrived at a conclusion in this regard. Nevertheless, the town board approved the resolution of intent to rezone on December 13, 1979 and, after planning board approval, rezoned the Homart site on December 27, 1979 without any resolution of the question of whether the Air Resources Permit was necessary. It is clear, therefore, that the town board violated its own ordinances and acted prematurely in passing both the declaration of intent and the rezoning itself.
Accordingly, on remand, the town board is directed to comply with section 59-26(D) prior to any declaration of an intent to rezone and to assure that the planning board has complied with section 59-27(A) before rezoning.
III. Other SEQRA Compliance Questions
In light of the basic invalidity of the declaration of intent to rezone, only brief mention need be made of the other failures of the town board as to compliance with SEQRA.
A. Perhaps the most significant of these errors is the town board’s failure to meet and accept the DEIS as satisfactory with respect to scope, contents and adequacy, as required by the ECL and the SEQRA regulations (ECL 8-0109, subd 3; 6 NYCRR 617.8 [b]). This error is primary because the scope and content of a DEIS necessarily limit the areas of environmental concern treated in the document. While some limitations are inevitable, the default of the town board in this case allowed the developer to ignore areas of potential impact which were of sufficient consequence to occasion negative commentary on the DEIS from governmental agencies and interested parties. Moreover, the regulation requiring this finding, although *868 vague on this point, seems to state by implication that the SEQRA process cannot run concurrently with other involved processes (such as zoning) until the lead agency has approved the DEIS. Thus, the application is not complete until the lead agency has issued its approval. Accordingly, the town board’s actions on the application were without legal effect, as no completed application was before the board.
On remand, the town board should formally act upon the DEIS with respect to its scope, content and adequacy, as required, prior to taking any further steps in the SEQRA process.
B. The petitioners also contend that the board did not publish its notice of completion of the DEIS or the notice of the public hearing in a newspaper of general circulation as required by 6 NYCRR 617.10 (f). Rather, they argue, publication was limited to the Webster Herald, a weekly newspaper distributed in the Webster area but not distributed regionally. Without extensive discussion, it suffices to point out that the area of potential impact, in environmental terms, is the Webster area. The petitioners, all of whom live or own property in the impact zone, are within the area served by the Webster Herald, and do not argue that they did not receive notice.
C. The petitioners next contend that the published notice of the DEIS hearing, in stating that public comment would close on December 17, 1979, violated the requirement of a 10-day public comment period following hearings on a DEIS (see 6 NYCRR 617.10 [d] [3]). In this regard, the regulation itself is vague. It provides that the lead agency must give notice that public comment on the DEIS will be received for not less than 30 calendar days from the first filing and circulation of the notice of completion (in this case, December 17, 1979) or not less than 10 days following a DEIS public hearing (in this case, December 23, 1979).
Although it is unnecessary here to decide whether the 10-day period is required in all cases in which a public hearing is held, the board attempted to comply with the 10-day requirement by extending the public comment period to December 23, 1979 during the course of the hearing. In so doing, the petitioners argue that the board ran afoul of section 25-a of the General Construction Law, which tolls the requirement for the performance of any act where the final date for performance of that act falls on a Saturday, Sunday or a *869 public holiday. As December 23, 1979 was a Sunday, and the 24th and 25th were part of the Christmas weekend, the proper closing date, according to petitioners, should have been December 26, 1979.
Although, as a practical matter, the General Construction Law would operate to automatically extend the time period beyond a Saturday, Sunday or holiday, it is sufficient for the purposes of this discussion to suggest that provision for a public comment period which extends 10 calendar days (not including Saturdays, Sundays and holidays as the final dates) beyond the date of a scheduled public hearing would be the better practice.
D. Also raised as error is the town board’s failure to comply with the requirements for filing the DEIS and the notices of completion, specifically the State and Federal clearinghouses as required by 6 NYCRR 617.10 (d). In its return, the town has submitted certified mail receipts showing delivery of the DEIS to the necessary agencies, but nowhere is there any showing that the town board filed notices of completion with the clearinghouses in a timely manner. While this error seems trivial at first glance, it has a discernible effect in the SEQRA process, in that the regulations provide that the DEC will publish all notices of completion in the Environmental Notice Bulletin. Thus, if the notice is not filed in a timely fashion the DEC’s publication of it will be ineffective. In this case, for instance, the DEC did not publish the notice of completion until after the public hearing and the negative declaration. Accordingly, on remand, the town is directed to file the required notice in timely fashion with the State and Federal clearinghouses.
IV. The December 26, 1979 Private Meeting of the Town Board
The petitioners contend that the December 26, 1979 private meeting of the town board violated the Open Meetings Law (Public Officers Law, § 95 et seq.).
Although section 95 of the law provides that, as a matter of policy, the citizens of New York are entitled to have public business performed in an open and public manner, and that the citizens of the State are entitled to attend the deliberations that go into the making of public policy, subdivision 1 of section 103 exempts from its provisions "judicial or quasi-judicial proceedings”.
*870 The leading case on the scope of the exemption of subdivision 1 of section 103 of the Public Officers Law is Matter of Orange County Pub., Div. of Ottaway Newspapers v Council of City of Newburgh (60 AD2d 409, affd 45 NY2d 947), in which it was held, inter alla, that a deliberative session of the Newburgh Board of Zoning Appeals could be closed to the public. In reaching this conclusion, the court reasoned that these deliberations are judicial in nature, as they affect the rights and liabilities of individuals (60 AD2d, at p 418).
As was the case with the zoning board meeting in Matter of Orange County Pub., Div. of Ottaway Newspapers v Council of City of Newburgh (supra), the December 26, 1979 meeting of the town board here was conducted for the purpose of reaching a decision on the basis of evidence submitted at a public hearing. Similarly, the actual vote was taken and the decision announced at a subsequent public meeting. Thus, it is apparent that the December 26, 1979 meeting was exempt from the Open Meetings Law requirements (accord Matter of Tuxedo Conservation & Taxpayers Assn. v Town Bd. of Town of Tuxedo, 69 AD2d 320, 329-331, supra).
Accordingly, the contention of the petitioners is without merit and their application for fees and costs allowed by the Open Meetings Law is denied.
CONCLUSION
The petitioners are clearly entitled to the relief sought, specifically the vacating of the December 13, 1979 declaration of intent to rezone, the December 27, 1979 negative declaration and the December 27, 1979 resolution rezoning the Ho-mart site to PCS. Insofar as this relief is granted by way of CPLR article 78, it is held that the town board’s issuance, as lead agency, of the negative declaration and its handling of the SEQRA process was arbitrary, capricious and an abuse of discretion under CPLR 7803 (subd 3). Summary judgment relief is granted in the declaratory judgment actions, as it is equally clear that the petitioners, as landowners and residents, were denied due process of law by the actions of the town board in the manner in which it approved rezoning.
It is not necessary, however, to grant petitioners the injunctive relief sought. Upon the issuance of an order and judgment in conformance with this opinion, the actions about which the petitioners complain will be nullities and all parties will be placed in status quo ante. Should the town in the *871 future violate the requirements of SEQRA or the town zoning ordinance, there will be ample opportunity to test its actions in the same manner utilized here by the petitioners.
Accordingly, petitioners’ motions to consolidate and their motions for summary judgment are granted to the extent indicated. Respondents’ motions are, in all respects, denied.
I wish to compliment all counsel for the able and commendable scholarship of their briefs. Their careful and thorough research, reflecting many hours of labor, was of great assistance.

 For ease of reference, the terms "petitioners” and "respondents” will be used for the parties although they are also "plaintiffs” and "defendants” in the declaratory judgment actions.