# H.O.M.E.S. et al., Appellants, v New York State Urban Development Corporation et al., Respondents.

Fourth Department, July 13, 1979

## APPEARANCES OF COUNSEL

*Richard A. Schechter* for appellants.

*Bond, Schoeneck & King (John A. Beach* of counsel), for New York State Urban Development Corporation and another, respondents.

*David M. Garber, Corporation Counsel (Eleanor Theodore* of counsel), for City of Syracuse Planning Commission, respondent.

## OPINION OF THE COURT

WITMER, J.

Appellants are landowners in the City of Syracuse and reside therein in close proximity to the former Archbold Stadium on the campus of Syracuse University. They seek reversal of a judgment at Special Term which dismissed their petition and supplemental petition in a CPLR article 78 proceeding for the review and annulment of determinations by several respondents herein which gave Syracuse University approval for the destruction of Archbold Stadium and the construction on its site of a new year-round sports facility, referred to as a domed stadium. The basic ground for the objection to the project and for instituting the article 78 proceeding is the alleged failure of respondent to comply with the legal requirements with respect to the environmental impact which the new facility will have on the area. Upon review of the record we feel compelled to modify the judgment and grant the petition and supplemental petition in substantial part.

For some time prior to the fall of 1978, Syracuse University made extensive efforts to find a suitable location for a new sports facility. At every turn it met with objections, and it later reported that it had been denied the privilege of erecting such structure on approximately 40 different sites. In September, 1978 the New York State Legislature appropriated "[t]he sum of fifteen million two-hundred and fifty thousand dollars

* * * from the capital construction fund to the New York state urban development corporation" (UDC) and provided that "fifteen million dollars ($15,000,000) of which shall be used as a supplement to funds of Syracuse University for the purpose of construction of a domed athletic facility to be located on the present site of Archbold Stadium", and "two hundred fifty thousand dollars ($250,000) of which shall be used * * * for construction supervision expenses of the corporation" (L 1978, ch 776, § 4). The Legislature further provided that UDC furnish technical assistance to the State in the form of general supervision of the construction and administration of the grant of the State moneys appropriated therefor; and the Director of the Budget was directed not to issue "a certificate of the approval of the availability" of the funds until UDC had entered into an agreement with Syracuse University that the university would pay all construction costs above the State's appropriation and that the New York State Office of Parks and Recreation could use the facility up to 20 days per year without charge.

With miraculous speed the necessary steps were taken to advance the project thus supported by the Legislature. On October 5, 1978 the UDC authorized the specified contract with Syracuse University. On the next day the attorneys for the university forwarded to UDC a memorandum which they had prepared concerning the impact of the State Environmental Quality Review Act (SEQRA) upon the proposed new facility on the site of Archbold Stadium. They concluded therein that such statute does not apply to this project because it is being started before November 1, 1978 and this is not a Type I action within the compass of that act (Environmental Quality Review, ECL art 8) and the regulations (6 NYCRR 617).

On November 2, 1978 Impact Consultants of Syracuse submitted to Syracuse University a study entitled "Environmental Assessment" of the new stadium. They concluded that action to be taken outside the scope of the stadium project would adequately mitigate the transportation and parking problems which the stadium was expected to generate.

On November 14, 1978 Syracuse City Planning Commission deferred to UDC as "the lead agency for the purpose of conducting the environmental review of the proposed domed athletic facility" under SEQRA. On November 15, 1978 the Syracuse-Onondaga County Planning Agency wrote a letter to

the university, with copies to the city planning commission and the county planning board, expressing its concern for the "increased traffic flows and the need for parking" to avoid massive traffic congestion in the city and immediate neighborhood of the stadium, and it suggested that a plan approved by "key governmental agencies" should be developed, including adequate vehicular access and parking for Crouse-Irving Memorial, Veterans' and Upstate Medical Center complexes.

On November 21, 1978 Syracuse University applied to the city planning commission for approval of its project for replacing Archbold Stadium with a new domed stadium in the existing planned institutional district (PID). It estimated the cost of the project at $41,000,000, of which it would pay $26,000,000. It would have a seating capacity of 50,000 persons, an increase of 24,000 over the existing capacity of Archbold Stadium. The university estimated that only about 10 events annually would fill the new facility to capacity, and that its average attendance would run between 15,000 and 20,000 for another 45 events. It stated that it had already received bids for the demolition of the Archbold Stadium and that it "is satisfied [that the increase in traffic and parking demand to arise from the new facility] can be effectively resolved over the next two years". In some detail it discussed the traffic and parking problems and disclosed that no plan had been proposed to solve them; but it expressed confidence that "with the improved utilization of public transportation, a traffic plan acceptable to both the University and the community can be developed".

On November 27, 1978 the city planning commission held a special meeting for a formal detailed presentation of the domed stadium proposal. It was openly recognized that no plan to handle traffic had been devised. Fire Chief Hanlon spoke critically of the project, foreseeing traffic congestion, even riots, and no access for emergency vehicles. A witness from the Department of Transportation foresaw "a horrendous problem" with parking and said: "We're just not going to be able to get through". The new facility, he stated, has 15 exits whereas Archbold Stadium has only 6; and nearly twice as many people will pour out, twice as fast, into streets which cannot accommodate the present traffic. Counsel for the university responded that although they have no precise solution for these problems: "we have been advised by expert traffic planners that there is a feasible solution".

On that same date, November 27, 1978, UDC's expert, Mr. Freidberg, sent a memorandum to Mr. Jacobs, UDC's vice-president of construction, stating that at meetings of the university's representatives it was agreed that if possible UDC should issue (1) a finding that the stadium is an excluded action under SEQRA and (2) a negative declaration on its environmental impact, thus avoiding the need for an environmental impact statement (EIS). He added that to do this it must be established that the stadium is not a Type I action and that UDC's chief fiscal officer must certify that the application for funding preceded November 1, 1978.

Mr. Freidberg acknowledged the lack of traffic surveys to show the expected hourly traffic flow in the area and that in the absence of data on traffic and parking, "it is difficult to issue a negative declaration". He added, "I believe that before we can issue the conditional negative declaration we should obtain adequate assurances from the university of their intent and financial ability to carry out recommendations from the forthcoming traffic studies".

On November 28, 1978 the councilman for the district in which the stadium is located wrote to the city planning commission that before the project was approved, a specific plan should be required to solve the "already critical parking problems that exist in the university area during stadium events." On the next day the university's engineers advised UDC that acceptable traffic plans would be developed; and on November 30, 1978 Dr. Kaiser, a vice-president of the university, wrote a letter to UDC advising that "[w]ithin the next six months we expect that the [university's advisory] group will have produced a definitive plan for the management of stadium generated traffic and parking."

Also on November 30, 1978 the chief financial officer of the UDC certified the stadium project as approved before November 1, 1978; and on December 1, 1978 UDC issued a determination of nonsignificance (i.e., negative declaration) in accordance with regulation 6 NYCRR 617. UDC recognized that the project could have a significant effect upon the environment, but determined that such effect would be avoided by mitigating measures to be included in the project.

On December 5, 1978 the Onondaga County Planning Board approved the domed facility, based in part on the university's assurance that the traffic problems will be solved, and on the co-operative intentions of the UDC and the City of Syracuse in

the university's plans and efforts; but the county planning board suggested that the city planning commission condition its approval of the project on the submission to both planning agencies of final plans for traffic, for emergency access and for parking. Also on December 5, 1978 the city planning commission, by resolution, approved the university's application to construct the stadium in the university's PID, relying on UDC's determination that the project was not subject to SEQRA; but the commission added that it expected the university and the *ad hoc* task force within six months to prepare a traffic and parking plan acceptable to the public.

On January 12, 1979 this article 78 proceeding was instituted to review the above determinations of approval, and it was supplemented on February 6, 1979. We shall limit our discussion to three principal issues: first, whether as a matter of law UDC erred in determining that an environmental impact statement was not required, second, whether as a matter of law the city planning commission erred in determining that the university's application was in substantial compliance with the city's zoning requirements and third, upon an affirmative answer to questions one and two, what remedy should be granted to petitioners.

### ENVIRONMENTAL IMPACT STATEMENT

In enacting ECL article 8 (L 1975, ch 612), the New York State Legislature declared a State policy to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources (ECL 8-0101) and its intent that all regulatory agencies conduct their affairs with an awareness that they are stewards of the air, water, land and living resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations (ECL 8-0103, subd 8; 8-0109, subd 1). Environment is defined in the statute as "the physical conditions which will be affected by a proposed action, including land, air * * * noise * * * and existing community or neighborhood character" (ECL 8-0105, subd 6). The primary method of achieving the intended surveillance and protection is the requirement of the preparation and submission of an environmental impact statement for any action, including that requiring agency approval if it may have a significant effect on the environment (ECL 8-0109, subd 2 *et seq.*). The New York State Urban Development Corporation, designated by the Legisla-

ture to supervise the State's partial funding of the stadium, and the city planning commission are agencies governed by this law (ECL 8-0105, subd 4, par [i]) and the regulations adopted thereunder (6 NYCRR Part 617), and the construction of the domed facility herein is an "action" subject to such law and regulations (6 NYCRR 617.2 [b]).

Prior to November 1, 1978 the State Environmental Quality Review Act (SEQRA) (ECL 8-0101 *et seq.*) applied to all direct State actions and all other funding and permit required actions which were included in the Type I list prepared pursuant to the statute (see ECL 8-0117; 6 NYCRR 617.15 [eff Jan. 24, 1978]); and in our view, despite the efforts made in this case to avoid the application of SEQRA, the statute applied to the domed facility project.

The necessary local permit from respondent city planning commission had not been issued on November 1, 1978, for it was not approved until December 5, 1978. Hence, we do not need to determine whether UDC's control of this project was so pervasive as to constitute a direct State action (6 NYCRR 617.2 [h] [eff Jan. 24, 1978]) or whether this project was included by implication in the list of Type I actions (6 NYCRR 617.15 [eff Jan. 24, 1978]) or whether it was inappropriate after November 1, 1978 for UDC to have certified this project which included no plan for controlling traffic and parking (6 NYCRR 617.3 [i] [1] [eff Jan. 24, 1978]). The local permit for the construction having been approved and issued after November 1, 1978, an environmental assessment was required to determine whether construction and use of the facility might have a significant effect on the environment. The regulations for the New York State Urban Development Corporation provide that because of the varied nature of possible actions, the list thereof in the regulations is not inclusive of all actions which may have a significant effect on the environment so as to require an environmental impact statement, and the omission of an action from the list does not necessarily exempt such action (21 NYCRR 4200.4 [l], 6 NYCRR 617.12). Subdivision (a) of 6 NYCRR 617.10 (eff Jan. 24, 1978) specified as important considerations for the need of an EIS, a substantial adverse change in existing air quality or noise levels (par [3]), encouraging or attracting of a large number of people to a place or places for more than a few days, compared to the number of people who would come to such place absent such action (par [5]), the impairment of the character or quality of

existing community or neighborhood character (par [7]), and the creation of a hazard to human health and safety (par [7]).

The regulations for the New York State Urban Development Corporation (21 NYCRR 4200.4 [1]) define Type I actions in the same general manner as they were defined in 6 NYCRR 617.15 (eff Jan. 24, 1978), and indicate actions which are likely to have significant effect on the environment, such as construction of new or expansion by more than 50% of existing area usage in (a) institutions of higher learning and (b) parking facilities requiring an indirect source permit under 6 NYCRR Part 203.

Respondents acknowledge that had the university's application contained provision for parking a substantial number of automobiles of patrons of the new facility, an EIS would be required (see 6 NYCRR 617.15 [e] Type I [b] [1], since Nov. 1, 1978, 617.12 [b] [6] [iii]). They concluded, however, that because no cognizance was given by the university to parking, the plan did not fall within the ECL. Like the proverbial ostrich, respondents have incredibly put out of sight and mind a clear environmental problem. By any assessment, the stadium is a major project, that is, a Type I action (6 NYCRR 617.15, since Nov. 1, 1978, 617.12). It is estimated to attract from 5 to 10 times as many patrons per year as did Archbold Stadium. The record shows that the traffic and parking problems have heretofore been serious on days when the stadium was used. With the new stadium, they will be much worse in the absence of comprehensive plans and actions to avoid them. Without such, not only will the residents in the area have extreme difficulty entering and leaving their homes and enjoying the use thereof but, more importantly, even fire fighting equipment and other emergency vehicles will be unable to get through to serve the public.

Whether the UDC properly issued its negative declaration that the project will have no significant impact on the environment and hence there is no need for an EIS depends upon whether it made a thorough investigation of the problems involved and reasonably exercised its discretion (ECL 8-0109, subd 4; 21 NYCRR 4200.5 [a], [c], 4200.6). Since the State law was modeled after the Federal law in this respect (see Governor's Memorandum, 1975 McKinney's Session Laws, p 1761), for construction of the State law we look to the cases which have construed the National Environmental Policy Act (US Code, tit 42, § 4321 *et seq.*).

To support UDC's determination, the record must show that it identified the relevant areas of environmental concern, took a "hard look" at them *(Kleppe v Sierra Club,* 427 US 390, 410, n 21; *Maryland-National Capital Park & Planning Comm. v United States Postal Serv.,* 487 F2d 1029, 1040) and made a "reasoned elaboration" of the basis for its determination *(City of Rochester v United States Postal Serv.,* 541 F2d 967, 973). In a case of this sort, "there is a relatively low threshold for impact statements" *(Maryland-National Capital Park & Planning Comm. v United States Postal Serv., supra,* p 1041), and "such a statement should be required where the action may fairly be said to have a potentially significant adverse effect" *(Hanly v Kleindienst,* 471 F2d 823, 831). We note especially that although SEQRA was modeled after the Federal law, the latter requires an EIS only for any "major Federal *actions significantly affecting* the quality of the human environment" (US Code, tit 42, § 4332, subd [2], par [c]; emphasis added), whereas SEQRA is more demanding and requires an EIS for any action *"which may have a significant effect* on the environment" (ECL 8-0109, subd 2; emphasis added).

The record shows that UDC did not meet the legal requirements in arriving at its determination that the planned domed facility had no environmental significance on the area. Clearly UDC failed to take a "hard look" at the problems and adverse potential effects of the project on traffic stoppage, parking, air pollution or noise level damage. Not only did it fail to analyze the traffic and parking problems entailed, but it vaguely recognized their existence and relied upon general assurances that after the problems developed the university and City of Syracuse would adequately mitigate them by some unspecified appropriate action. It gave no consideration to the effect on the neighborhood of the operation of this facility (see *Goose Hollow Foothills League v Romney,* 334 F Supp 877) nor to the consequence of unplanned "subsequent action" which the contemplated new parking facilities would have on the area (see *City of Davis v Coleman,* 521 F2d 661, 674-676). It is inconceivable that the Legislature envisioned or intended that its EIS requirements could be avoided by an applicant and agency which both declined to recognize egregious environmental problems. In Alice-in-Wonderland manner, respondents separated and put aside the realities of the traffic and parking problems from the totality of this project.

We reject the contention that because the regulations do not

expressly list the construction of a stadium, the instant project is not a Type I action and therefore no EIS is required. The regulations expressly negate this argument; and in any event the fact that this project may have a significant impact upon the environment requires the filing of an EIS. Moreover, as above noted, the record is clear that UDC was fully aware of the traffic and parking problems in the area, and its determination that the construction and use of the domed facility will not significantly affect the environment is directly contrary to the facts (see *City of Davis v Coleman, supra,* pp 674-676); and its action in issuing the negative declaration was arbitrary and capricious *(City of Rochester v United States Postal Serv.,* 541 F2d 967, 973, *supra; Matter of Pell v Board of Educ.,* 34 NY2d 222).

### ZONING REQUIREMENTS

The university applied to respondent Syracuse City Planning Commission for the inclusion of the new facility in an existing planned institutional district, within the provisions of the zoning ordinance of the City of Syracuse (part B, § VIII, art 1); and in approving the application the planning commission properly found that the facility is an institutional use within the meaning of the ordinance. In seeking the benefits of the ordinance, the university, of course, subjected itself to the reasonable provisions thereof *(Matter of Diocese of Rochester v Planning Bd. of Town of Brighton,* 1 NY2d 508, 519-520).

The ordinance provides that the purpose of such PID is to permit flexible development of institutional lands, including provisions "for an efficient and safe circulation system for both pedestrians and vehicles (part B, § VIII, art 1, par 1, cl [d]) and "adequate parking space for immediate and future needs" (cl [e]). It provides that "Off-Street Parking shall be permitted and required in accordance with the schedule provided in Section i (4) of this Article" (par 2, cl [b], subcl [2]). The ordinance requires that prior to the establishment of a planned institutional zone, the applicant must present to the commissioner of planning a district plan with supporting material and explanations (par 3, cl [d], subcls [1], [2]), and that prior to the issuance of a construction permit a project plan with supporting material and explanations must be filed (par 3, cl [f]); and the requirements are specified. The commissioner is authorized to waive the requirements up to 50% thereof "if such a waiver does not jeopardize any article of the

intent for this zone and if the waiver is in no way detrimental to the adjoining property or development" (par 3, cl i). The commissioner "must find the parking provisions on the Project Plan in conformity with the intent of this zone * * * unless other arrangements satisfactory to the Commissioner are submitted which indicate the provision of adequate off-street parking" (par 3, cl i, subd [4]).

The plan submitted by the university and approved by the planning commission in no way complied with the above-recited provisions for traffic and parking for the protection of the neighborhood, and was in absolute disregard of the substantial evidence before the commission that the project posed tremendous traffic problems, endangering the safety of the neighborhood, without a planned solution. Thus, the intent of the ordinance (see *Matter of New York Life Ins. Co. v Galvin,* 35 NY2d 52, 57) was frustrated, and the action of the commission in approving the application was not supported by substantial evidence and was arbitrary, capricious and an abuse of discretion (see *Matter of Pell v Board of Educ., supra,* p 231; 2 Anderson, New York Zoning Law and Practice [2d ed], § 22.16).

CONCLUSION

During the five or six months that this proceeding has been pending, action under the determinations by the UDC and the city planning commission was not stayed, because of respondents' assurances to the court and their insistence on the urgency of continuing the construction of the facility. We are advised that Archbold Stadium has now been demolished and the foundations for the new facility have been laid and the steel installed. Millions of dollars have been expended on the project. The court, of course, is sympathetic with the objectives of respondents and recognizes that in this practical world it is very likely that some means can be found to solve the environmental problems. The court is mindful that over six months ago respondent university gave assurance that within six months acceptable traffic and parking plans would be completed. Indeed, it was on the strength of such assurances that respondents UDC, city planning commission and the Onondaga County Planning Board acted favorably on the university's application.

The ECL may not be flouted, and the court must uphold it. The determinations of UDC and Syracuse City Planning

Commission must, therefore, be held arbitrary and capricious and subject to being vacated. Respondents should be stayed, therefore, from proceeding with the authorization, funding and construction of the domed facility *(Steubing v Brinegar,* 511 F2d 489, 496-497).

In recognition of and in reliance upon the various representations made in November and December, 1978 that within six months suitable traffic and parking plans could and would be developed, the injunction to be contained in the judgment to be entered on this decision should be stayed for a period of four months from the entry of the judgment, in order to afford respondents an opportunity to comply with the provisions of the State Environmental Quality Review Act and the city zoning ordinance (see *City of Rochester v United States Postal Serv.,* 541 F2d 967, 978, *supra; Jones v District of Columbia Redev. Land Agency,* 499 F2d 502, 512-513; *Goose Hollow Foothills League v Romney,* 334 F Supp 877, 880, *supra).*

We have considered petitioners' other contentions and find them to be without merit.* In all other respects, therefore, the judgment should be affirmed.

DILLON, P. J., SCHNEPP, CALLAHAN and MOULE, JJ., concur.

Judgment unanimously modified to grant petition and supplemental petition in part in accordance with opinion by WITMER, J., and otherwise affirmed, without costs.

---

* We have not reached the merits of the issue as to whether an air quality permit is required for this facility, because we agree that petitioners do not have standing to enforce the regulations with respect thereto.