OPINION OF THE COURT
Bentley Kassal, J.
ISSUE
The Commissioner of Environmental Conservation has promulgated very arcane and esoteric regulations regarding environmental controls. The issue presented here is whether he has fully complied with these very rules in his approval of one phase of Westway (the proposed New York City Westside Highway Project). The answer to this question requires an excursion into the complex maze of two different repositories of environmental laws and regulations: the New York State Tidal Wetlands Act (TWA) and the State Environmental Quality Review Act (SEQRA).
*515 FACTS
The petitioners are four environmental and conservation organizations, a Greenwich Village community group and several individual residents of the western part of Greenwich Village, who commenced this CPLR article 78 proceeding to vacate and annul a March 24, 1980 determination of the respondent Commissioner of Environmental Conservation of the State of New York (the Commissioner). This ruling had the effect of removing about 200 acres of the proposed Westway construction area on the eastern shoreline of the Hudson River from all regulatory controls under TWA.
The Department of Transportation of the State of New York (DOT), which is responsible for overseeing the construction of Westway, has intervened in support of the Commissioner’s position and, by stipulation, the petition has been reduced to two causes of action, alleging different grounds for vacating the Commissioner’s order.
In 1973, TWA and article 25 of the Environmental Conservation Law was enacted “to preserve and protect tidal wetlands, and to prevent their despoliation and destruction” (ECL 25-0102). Pursuant to ECL 25-0201, the Commissioner, as part of the State-wide environmental plan, was required to develop and maintain an inventory of all tidal wetlands and wetlands boundary maps and, pursuant to ECL 25-0302, to establish land use regulations, governing such wetlands. Among the maps thereafter produced were five covering the west shore of Manhattan from Harrison Street to West 36th Street, designating approximately 200 acres of the Hudson River as littoral zone (LZ), i.e., area covered by less than six feet of water at mean low tide.
In furtherance of the objectives of the TWA, the Department of Environmental Conservation (DEC) promulgated an extensive set of regulations, entitled Tidal Wetlands — Land Use Regulations, 6 NYCRR part 661, which designate draining, dredging, filling, disposal of dredged material, construction and other new activities in LZ areas, as regulated activities and “presumptively incompatible uses” (6 NYCRR 661.5, 661.4 [ee]). Since the construction of Westway on landfill in the Hudson River would *516 clearly entail almost all of these activities, the DOT, as Westway’s sponsor, had two choices: (1) obtain a development permit under 6 NYCRR 661.9-661.25; or (2) seek “demapping”, i.e., an amendment of the existing maps to remove the LZ designation under 6 NYCRR 661.26-661.27. The DOT chose the latter course, petitioning the DEC to de-map the 200 acres for the proposed Westway construction.
After investigations and public hearings on the petition to de-map, the Commissioner reached these findings and conclusions, inter alia, in his order of March 24, 1980:
(1) Approximately 150 of these 200 acres are more than six feet below the mean low water level and, accordingly, were improperly designated LZ (a finding not now disputed);
(2) The remaining 50 acres are within six feet below the mean low water level or are situated under piers or otherwise impractical to survey;
(3) The same 50 acres of potential LZ area have been so affected by numerous forms of construction and pollution that they no longer function biologically as a typical LZ wetland commmunity, although they still support some “surviving” forms of plant and animal life.
Based upon these findings, the Commissioner decided to amend the tidal wetlands maps to de-map these 200 acres of the Westway construction area.
CONTENTIONS OF THE PARTIES
Petitioners challenge the Commissioner’s action on two bases: (1) Failure to consider all relevant tidal wetland values in reaching his determination; and (2) Failure to comply with the requirements of the SEQRA, ECL article 8.
In opposition, the Commissioner argues: (1) The single tidal wetland value which he considered and relied upon — biological productivity or marine food production — is the only factor relevant to a de-mapping determination under the ECL or 6 NYCRR 661.26; and (2) SEQRA does not apply because: a. Westway is exempted from SEQRA by “grandfathering” provisions of that act; and b. de-mapping is merely a ministerial act.
*517 FINDINGS
(1). Tidal Wetlands Values
[Initially, it should be noted that all parties agree that this aspect of the Commissioner’s order is being challenged herein solely upon claims that it was affected by an error of law and was arbitrary and capricious (CPLR 7803, subd 3). There is no claim that it was not supported by substantial evidence (CPLR 7803, subd 4).]
As stated earlier, the Commissioner’s order was based upon his conclusion that these 50 acres, which are within the mean low water definition of LZ areas, did not function biologically as a tidal wetland. This determination was based upon the following interpretation of the regulations by the Commissioner (March 24, 1980 order, p 9): “Section 661.26 was written to provide that such areas with limited primary and benthic [relating to the water bottom] productivity would not be regulated under the Tidal Wetlands Act. This provision addresses biological productivity only”.
Petitioners argue that this is too narrow a reading of the TWA and regulations, citing the following language from other sections of the regulations, inter alia: “It is the public policy of the State *** to preserve and protect tidal wetlands *** by establishing regulations that allow only those uses * * * compatible with the preservation, protection and enhancement of the present and potential values of tidal wetlands (including but not limited to their value for marine food production, wildlife habitat, flood and hurricane and storm control, recreation, cleansing ecosystems, absorption of silt and organic material, education and research, and open space and aesthetic appreciation)” (6 NYCRR 661.1).
“Tidal wetlands *** have many values. These values include, but are not limited to, marine food production, wildlife habitat, flood and storm and hurricane control, recreation, cleansing ecosystems, sedimentation control, education and research, and open space and aesthetic appreciation” (6 NYCRR 661.2 [a]).
“[L]ittoral zones include areas of extreme variability in their contributions to marine food production and other tidal wetland values * * * Even in * * * relatively unpro *518 ductive areas, however, values other than marine food production are often present, and these areas often have the potential to become more biologically productive in the future *** littoral zones play an important role in flood and hurricane and storm control, although they are less important in this regard than coastal fresh marshes, intertidal marshes and high marshes or salt meadows * * * these areas have an important function in cleansing ecosystems and absorbing silt and organic materials” (6 NYCRR 661.2 [e]).
Finally, 6 NYCRR 661.27 requires the Commissioner to consider the purposes and policy of the TWA in making any determinations with regard to amending wetlands boundary maps.
On the other hand, the Commissioner points to 6 NYCRR 661.26 which expressly provides the following as the only criteria for amending a wetlands boundary map: “The commissioner may amend an inventory map * * * where he determines that certain lands under tidal waters, while possessing the physical characteristics of littoral zone * * * are not littoral zone * * * because such lands do not function biologically as tidal wetlands, exhibit little primary productivity and are populated by few benthic organisms, due to such factors as pollution, sedimentation or other physical disturbances. The commissioner may take such action on his own motion or at the request of any person.” He refers to 6 NYCRR 661.2 (f) as further support of this position. This provides: “Some areas possess the physical characteristics of littoral zones *** but do not function biologically as tidal wetlands. Such areas have generally been heavily impacted by pollution, sedimentation or other artificial disturbance, exhibit little primary productivity, and are populated by few benthic organisms. Such areas require identification on a case-by-case basis and when so identified should no longer be treated as tidal wetlands”.
I cannot disagree with the Commissioner’s above interpretation. Sections 661.26 and 661.27 of title 6 of the Official Compilation of Codes, Rules and Regulations of the State of New York clearly spell out very limited criteria for de-mapping — biological productivity — and these specific *519 provisions, keyed to de-mapping, prevail over those provisions containing general policy statements. Thus, it cannot be said, as a matter of law, that the action of the Commissioner was irrational or unreasonable.
As a general rule, the construction and interpretation of an agency charged with administering a statute or regulation should be accorded great weight and upheld, if not irrational or unreasonable. (Matter of Sigety v Ingraham, 29 NY2d 110, 114; Matter of Howard v Wyman, 28 NY2d 434, 438; Matter of Mounting & Finishing Co. v McGoldrick, 294 NY 104, 108.) Having determined that the Commissioner applied the correct criteria under the TWA in reviewing the petition to de-map, the only question remaining on this branch of the motion is whether the report and order support the decision to de-map. I conclude there was a rational basis in the record for such findings and conclusions and, thus, I am unable to disturb them. (Matter of Pell v Board of Educ., 34 NY2d 222, 231; Matter of 125 Bar Corp. v State Liq. Auth. of State of N.Y., 24 NY2d 174, 178.)
(2). Application of SEQRA
Thus, since I have determined that the actions taken under TWA were not improper, the next issue is whether the actions were proper under SEQRA — which is a separate chapter of the ECL with requirements distinct from those of TWA.
In enacting SEQRA, the Legislature declared that: “It is in the intent of the legislature that all agencies conduct their affairs with an awareness that they are stewards of the air, water, land and living resources, and that they have an obligation to protect the environment for the use and enjoyment of this and all future generations.” (ECL 8-0103, subd 8.)
It further declared that: “to the fullest extent possible the policies, statutes, regulations, and ordinances of the state * * * should be interpreted and administered in accordance with the policies set forth in this article.” (ECL 8-0103, subd 6.)
Pursuant to SEQRA, specifically ECL 8-0113, the Commissioner promulgated requirements for environmental *520 impact review which must be complied with prior to issuing. an approval of any proposed projects or activities. (6 NYCRR 617.3.)
The broad definitions of governmental actions regulated by SEQRA and the SEQRA rules (ECL 8-0105, subd 4; 6 NYCRR 617.2 [b]) would clearly apply to the de-mapping determination unless excluded by one of the express exemptions. In fact, the Commissioner does claim these two exemptions: (i) the project is “grandfathered” and excluded from coverage under ECL 8-0117 and 6 NYCRR 617.2 (m) because Westway had been undertaken or approved and “substantial time, work and money had been expended prior to the effective date of SEQRA” (Sept., 1976) and the rules (Nov. 1,1978); and (ii) the de-mapping is excluded as a “ministerial act” pursuant to ECL 8-0105 (subd 5) and 6 NYCRR 617.2 (n) (2), (s).
(i) Grandfathering
The Commissioner and the DOT argue that the demapping is excluded from SEQRA because the DOT instituted the Westway project in 1971 and “substantial time, work and money had been expended prior to the effective date of SEQRA” and the rules. They also argue that, on the basis of Westway’s exclusion, the de-mapping determination is also excluded from SEQRA since 6 NYCRR 617.2 (b) provides that: “For the purposes of this Part, the entire set of activities or steps (e.g., planning, design, contracting, construction and operation) can be considered an action * * * In the case of a project or activity involving funding or a permit from an agency, the entire project shall be considered an action, regardless of whether such funding or permit relates to the project as a whole or to a portion or component of it” (emphasis added).
Interestingly, if the DOT had sought a “permit” to construct Westway in the LZ area, pursuant to 6 NYCRR 661.7 et seq., it might well have fallen within the underlined language. However, the DOT instead proposed a far different “action”, with potential environmental impact well beyond that of Westway, itself. The relief requested in the DOT’s petition was the removal of all regulatory controls under the Tidal Wetlands Act, which is the effect of a *521 de-mapping. Thus, the entire area would be freed from all TWA controls for any other possible future projects which might be proposed by the DOT or other parties irrespective of the purpose. By way of illustration, whether or not Westway is ultimately constructed, any new activities in the de-mapped area — ranging from a garbage dump, a raw sewage disposal facility, an apartment house, to a marina or a restaurant — would be exempt from TWA requirements on this premise.
Although not controlling in my determination, the Commissioner, himself, in his prior determinations, apparently recognized the applicability of SEQRA and the distinction in treating Westway as a “grandfathered” project on one hand, and de-mapping on the other. On August 17, 1979, the DEC issued a “Notice of Determination of No Significance” with respect to the de-mapping, which expressly stated, that it was given “[p]ursuant to 6 NYCRR Part 617, the Rules and Regulations for the implementation of Article 8, State Environmentál Quality Review Act”. This was reaffirmed in the March 24,1980 order, challenged herein, in which the Commissioner stated, at page 3: “On August 17,1979, a negative declaration was issued under the State Environmental Quality Review Act, ECL, Article 8 *** SEQR does not apply to the Westway project itself because the Westway project is on the list of State projects submitted by DOT to the Director of the Division of the Budget and certified as ‘grandfathered’, or exempted from the requirements of the Act because of the substantial time, work or money that had already been expended on the project when the Act went into effect * * * As the project itself is outside SEQR, the negative declaration [a determination that the proposed action will not have a significant effect on the environment] goes to demapping only. The demapping itself was the only action subject to the criteria for a determination of significance under 6 NYCRR §617.11 [SEQRA] as to whether an EIS [environmental impact statement] is required” (emphasis added).
This analysis by the Commissioner is consistent with the regulations and leads to the inescapable conclusion that the de-mapping, as opposed to a mere construction permit, is not “grandfathered” out of SEQRA by the prior Westway *522 actions. Recognizing that such a decision might be reached, the Commissioner’s reply brief requests that SEQRA be applied only to the de-mapping determination and that the SEQRA challenges to factors relating solely to Westway be dismissed. Had the DOT applied for a permit, alone, and the same issued, that might be possible. However, the determination here challenged is the broad de-mapping determination — not a permit — from which it is impossible, on the record submitted, to carve out and isolate the potential effects of a permit.
(ii) Ministerial Acts
The Commissioner also argues that the de-mapping order is excluded from SEQRA under ECL 8-0105 (subd 5, par [ii]) and 6 NYCRR 617.2 (n) (2) as “official acts of a ministerial nature, involving no exercise of discretion”. As to the 150 acres that do not meet the six-foot mean low water level standards (6 NYCRR 661.4 [hh] [4]) there is no argument with this position since that can be decided by objective measurements. However, as to the remaining 50 acres, the Commissioner did not apply a simple formula dictated by statute or regulations.
In reaching his determination to de-map the 50-acre area, the Commissioner expressly relied on 6 NYCRR 661.26 which has been quoted above. Basically, in plain language, that section permits the Commissioner to demap an area which looks like an LZ, but does not act like an LZ. The evidence considered by the Commissioner, the discussion in his order and the regulatory criteria (6 NYCRR 661.26, 661.2 [f], [e]) indicate that this is no simple, nonjudgmental determination like the 150 acres. To borrow a phrase from athletic refereeing, such as football, it is a “judgment call” and hardly “an act of a ministerial nature, involving no exercise of discretion” as defined in ECL 8-0105 (subd 5, par [ii]).
CONCLUSION
The motion to dismiss the ninth cause of action alleging failure to comply with TWA is granted. However, on the basis of the above findings, SEQRA does apply to the March 24, 1980 order, in which the Commissioner expressly declined to consider the petitioners’ SEQRA objec *523 tions and did not conduct the comprehensive environmental impact review required under SEQRA.
Accordingly, the motion to dismiss the eighth cause of action is denied and the petition is granted to the extent of vacating the March 24, 1980 order and remanding the matter to the Commissioner for further proceedings consistent with this decision, including, expressly appropriate review, pursuant to the State Environmental Quality Review Act.
(On reargument February 4, 1981.)
Respondents move for reargument of this court’s order dated October 27, 1980, insofar as it vacated the order of the Commissioner of the respondent Department of Environmental Conservation (DEC), dated March 24,1980, and remanded the matter to the Commissioner. Upon reargument, respondents seek modification of this order to permit service of an answer to count 8 of the supplemental petition.
ISSUE
Does denial of respondents’ motion to dismiss Count No. 8 of the amended petition herein require this court to permit respondents to answer under CPLR 7804 (subd [f])?
DISCUSSION
The governing statute, CPLR 7804 (subd [f]), provides, in pertinent part: “(f) Objections in point of law. The respondent may raise an objection in point of law by setting it forth in his answer or by a motion to dismiss the petition *** If the motion is denied, the court shall permit the respondent to answer, upon such terms as may be just” (emphasis added).
A series of recent Third Department decisions — Matter of Tobin v Ford (49 AD2d 83), Matter of De Vito v Nyquist (56 AD2d 159) and Matter of Bayswater Health Related Facility v New York State Dept. of Health (57 AD2d 996) — enunciate the applicable rules of law: “ ‘leave to serve an answer [under CPLR 7804, subd (f)] should be refused only if it clearly appeared that no issue existed which might be raised by answer concerning the merits of petitioner’s application.’” (Matter of De Vito v Nyquist, supra, p 161; em *524 phasis added.) Special Term was fully informed of all issues and no new defenses could be raised in the answer requested to be served.
“Tobin stands for the principle that if there are questions of law and fact to be determined, a party which unsuccessfully moves to dismiss the petition must be permitted to answer. However, when, as here, there only remain questions of law, the resolution of which are dispositive, then the matter can be concluded without providing an opportunity for answer” (Matter of Bayswater Health Related Facility v New York State Dept. of Health, supra, p 997; emphasis added).
Clearly, valid questions of fact have been raised by respondents in this proceeding — e.g., what facts support the DEC’s August 17, 1979 “Notice of Determination of Non-Significance”? A question of law is also present herein — was this DEC determination arbitrary and capricious? In addition, it does not seem, as stated above, as if this “matter can be concluded without providing an opportunity to answer” on appropriate questions, such as what the respondent DEC Commissioner relied upon in demapping the lands in question.
A strong public policy argument, founded upon due process and notice requirements, does exist, entitling the public to know the bases for the DEC’s determination. It is to be noted that 6 NYCRR 617.10 (b), which follows, does mandate the furnishing of reasons therefor, so that the DEC should be required to elaborate: “a notice of determination that an EIS [Environmental Impact Statement] will not be prepared, based on a determination that the proposed action will not have a significant effect on the environment (negative declaration), shall be prepared *** The notice *** shall briefly state the reasons supporting determination.” (Emphasis added.)
Questions remain concerning whether or not the August 17, 1979 determination complies with this statutory language and whether DEC “made a thorough investigation of the problems involved and reasonably exercised its discretion.” (See H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d 222, 231-232, noting that SEQRA [the State *525 Environmental Quality Review Act] “requires an EIS for any action ‘which may have a significant effect on the environment’” [emphasis in original].)
Lastly, it is significant that petitioners have failed to demonstrate precisely how their rights, in any respect, would be substantially prejudiced if respondents were given leave to interpose an answer herein.
As a matter of fact, much of their opposition herein is related to conjecture as to what the DEC did intend by its determination of nonsignificance.
In reaching its decision, this court is mindful of the fact that remanding to respondent Commissioner for a new determination possibly encourages potential petitioners to become involved in this suit, a result potentially avoided by clarification of the factors in the DEC’s decision, via its filing an answer, which will serve to illuminate the situation and be constructive for all parties and purposes.
CONCLUSION
For these reasons, reargument is granted and, upon reargument, this court’s order dated October 27, 1980 is modified to the extent of permitting respondents to serve and file an answer to Count No. 8 of the supplemental petition herein within 10 days after service of the order to be settled with notice of entry thereof.