Southampton Association, Inc., Appellant, v Planning Board of the Village of Southampton, Respondent. George G. Semerjian, Intervenor-Respondent.

Second Department, July 8, 1985

### APPEARANCES OF COUNSEL

*Smith, Finkelstein, Lundberg, Crimmins & Yakaboski* (*Howard M. Finkelstein* and *Frank A. Isler* of counsel), for appellant.

*Emil F. DePetris* (*Richard E. DePetris* of counsel), for respondent.

*Reilly, Like & Schneider* (*Gilbert G. Flanagan* and *Bernard J. Reilly* of counsel), for intervenor-respondent.

### OPINION OF THE COURT

Per Curiam.

Intervenor George G. Semerjian is the owner in fee of a parcel of real property consisting of 34 acres located in the Incorporated Village of Southampton. The property had been used as a working farm. It abuts Windmill Lane, Breese Lane and White Street. The easternmost portion of the property, consisting of about five acres, is improved with the historic Kendrick house and several outbuildings and is situated in the village's OD

Office Business District. The balance of the property is zoned "R-20" single-family residential, which zoning classification requires a minimum lot area of 20,000 square feet.

In or about October 1982, following preliminary discussions with the respondent Planning Board of the Village of Southampton, the intervenor, George G. Semerjian, submitted a sketch plan to the Planning Board consisting of 48 lots (47 single-family homesites and 1 five-acre lot encompassing the Office Business District portion of the property). The plan, as submitted, conformed in all respects with the village's zoning regulations. Thereafter, on or about November 8, 1982, the intervenor submitted both long and short environmental assessment forms (EAFs) so that the Planning Board, as lead agency, could assess the potential environmental impact of the proposed subdivision. At its December 13, 1982 meeting, the Planning Board adopted a resolution authorizing the intervenor to submit a preliminary map which was to include the following revisions:

"1. The road which runs westerly from Windmill Lane shall be realigned so as to permit Nugent Street to be connected to it without a pronounced jog and, further, said road should be connected to the existing unnamed street which runs southerly from the premises.

"2. Cooper's Farm Road should be extended to tie in with the said road which runs westerly from Windmill Lane in such a manner as to prevent or discourage a right turn towards the unnamed road.

"3. An access spur should be provided from Cooper's Farm Road to the premises identified as 'East End Funding Corp.'.

"4. A park fee should be provided rather than a park".

A preliminary plat application was filed by the intervenor and the Planning Board scheduled and noticed a public hearing on the matter for January 10, 1983. During the pendency of the application for preliminary plat approval, the Planning Board received a comprehensive written SEQRA (State Environmental Quality Review Act, ECL art 8) evaluation from Wayne D. Brwyn, a planner for the Town of Southampton Planning Board; a transportation analysis prepared by PRC Voorhees for the petitioner's planner; and a detailed supplementary traffic report prepared by McCrosky-Rueter for the respondent Planning Board. On January 10, 1983, the Planning Board conducted a public hearing on the intervenor's application for preliminary approval of a plat which incorporated the above-quoted recommendations.

During the course of the hearing, the intervenor's attorney stipulated to an extension of time for the Planning Board to render a SEQRA determination pursuant to the Code of the Village of Southampton § 54-5 and it scheduled a meeting for January 24, 1983 for the purpose of rendering such a determination. Decision on the application for preliminary plat approval was deferred pending the SEQRA determination.

At the January 24, 1983 Planning Board meeting the public was allowed to comment upon the potential environmental impacts of the proposed subdivision. At the conclusion of the meeting the Planning Board issued a negative declaration, finding that because of certain mitigation measures to be employed, the subdivision would not have a significant effect on the environment within the meaning of SEQRA and that no environmental impact statement was necessary.

On February 24, 1983, the Planning Board granted conditional preliminary plat approval and on or about March 28, 1983 the intervenor submitted an application for final plat approval. The final proposal reduced the number of residential lots from 47 to 40, provided for a park, contained a redesign of the internal subdivision roadways and provided covenants to insure the preservation of the existing Kendrick house. These modifications came about as the result of various suggestions and recommendations. On July 11, 1983, a public hearing was held and by resolution dated August 8, 1983, the Planning Board granted final plat approval for the proposed subdivision.

Petitioner then commenced this CPLR article 78 proceeding to review the Planning Board's determination granting final plat approval.

We conclude that the Planning Board, as lead agency, reasonably exercised its discretion in issuing a declaration that the proposed subdivision would have no significant effect on the environment, thus obviating the need for an environmental impact statement (see, ECL 8-0109 [2]). The record amply demonstrates that the Planning Board "identified the relevant areas of environmental concern, took a 'hard look' at them * * * and made a 'reasoned elaboration' of the basis for its determination" (H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d 222, 232; see also, Matter of Manes v Simpson, 108 AD2d 914; Matter of United Petroleum Assn. v Williams, 102 AD2d 491; Matter of Town of Yorktown v New York State Dept. of Mental Hygiene, 92 AD2d 897, affd 59 NY2d 999; Matter of Cohalan v Carey, 88 AD2d 77, appeal dismissed 57 NY2d 672; Matter of Flynn v Flacke, 87 AD2d 930; Matter of Association for Dev. of Healthy

*Oneonta Community v Kirkpatrick,* 87 AD2d 934; *Matter of Harlem Val. United Coalition v Hall,* 80 AD2d 851, *affd* 54 NY2d 977). After reviewing both the short and long form EAFs submitted by the intervenor, the Planning Board listed 10 "potentially adverse impacts" which it found could be mitigated if adequate precautionary steps were taken by the intervenor. For example, as to drainage, the Planning Board noted that while "[t]he project is likely to cause erosion, and may be incompatible with existing drainage patterns", any impact could be remedied because "[t]here is enough area within the project site to create another drainage/recharge area or expand the proposed area, if that is required".

On this appeal, petitioner claims the negative declaration is defective because (1) the Planning Board failed to identify and analyze the significance of all the reasonably foreseeable impacts of the subdivision and (2) the plan, as approved, does not include the mitigating devices called for in the Planning Board's SEQRA resolution of environmental nonsignificance. There is no merit to either claim.

Petitioner contends that the Planning Board failed to consider "[t]he impact on the historic Kendrick homestead [the existing house] of locating the subdivision access road * * * within 33 feet of the building" and "of future commercial development of the balance of the 5 acres" on the historic building. However, the record reveals that the situs of the existing home was considered in detail in the resolution granting preliminary approval as well as in the Planning Board's SEQRA determination of environmental nonsignificance, wherein it stated, *inter alia,* that the developer would covenant that "not less than two acres of land will be allocated to the lot containing this structure" and that such "covenants will be required in order to preserve [the] building". By requiring not less than two acres of land be allocated to the existing home, the Planning Board significantly limited any future commercial development of the property to approximately three acres. In fact, the Planning Board has already eliminated about 39% of the currently commercially zoned property from any future development whatsoever. Thus, it can hardly be said that the Planning Board failed to consider the impact that subdivision of the property would have on the existing historic house.

Petitioner contends further that the Planning Board failed to consider the impact on traffic flow and safety resulting from (1) the design of the intersection within the plat, (2) the waiving of right-of-way and paving width requirements in the commercial

section of the subdivision, (3) the planned mode of access to the subdivision in that alternate means were not considered, and (4) "[t]he impact on * * * traffic volume and safety of future commercial development of the balance of the 5 acres adjacent to the historic site and located in the OD District". Again, the record shows the petitioner's claim to be lacking in merit. Before rendering its SEQRA determination of environmental nonsignificance, the Planning Board received and considered a transportation analysis as well as a supplemental traffic report. These studies indicated that while the roadway plan as proposed was adequate for the time being it would be prudent for the respondent to provide for future traffic increases in the business district. Based on the advice of these experts the Planning Board provided in both its SEQRA determination and resolution granting final plat approval for a reservation of land for future street use if and when needed. The intersection of which petitioner complains was required by the respondent Board to be designed in a manner which would enhance its aesthetic setting by creating an island which would contain and preserve a number of trees. As to the right-of-way and paving width modifications, the record shows that respondent's approval was premised upon the village board of trustees' stated intention to prohibit on-street parking along the roadway. Thus, it is clear that the Planning Board did consider the impact of the proposed subdivision on traffic flow and safety.

As stated above, petitioner claims that the approved plan fails to include a number of the mitigating devices called for in respondent's SEQRA determination. This is not so. In its SEQRA determination respondent indicated that a cluster subdivision would be a *possible* mitigating measure to a number of the *potentially* adverse environmental impacts it listed. However, it must not be overlooked that those comments (item 4 — cluster plan "would also provide parkland"; item 6 — cluster plan "would allow a fair amount of farm land to be preserved"; item 8 — "the requirement of a park would * * * help") were based upon the preliminary grid layout which contained 47 single-family lots and no parkland. The approved plan contains a grid layout calling for 40 single-family homes as well as a substantial park area consisting of almost three acres. As to the permanent loss of agricultural lands occasioned by the development of the property, the Planning Board noted that a cluster plan would preserve farmland but that it was questionable whether the "small amount [remaining] would create a viable parcel of farmland".

In sum, we conclude that the Planning Board identified the potential environmental impacts of this subdivision, looked at them in detail, and gave a reasoned approach to them in rendering a declaration of environmental nonsignificance.

We have considered the remaining contentions of the petitioner and find them to be without merit.

Accordingly, the judgment appealed from should be affirmed, with one bill of costs.

LAZER, J. P., MANGANO, BRACKEN and NIEHOFF, JJ., concur.

Judgment of the Supreme Court, Suffolk County, dated December 21, 1983, affirmed, with one bill of costs.