OPINION OF THE COURT
Kevin M. Dillon, J.
The petitioners seek a judgment declaring invalid the rezoning of 182 acres of land by the Town Board of the Town of Alabama for failure to comply with the letter and spirit of the New York State Environmental Quality Review Act (SEQRA) and other related claims for relief. Respondent Lancaster Stone Products Corporation intends to operate a quarry on the rezoned acres. The issues before the court involve the interrelationship between SEQRA, the rules and regulations implementing that Act, the New York State Mined Land Reclamation Law (MLRL; ECL art 23, tit 27) and the Town of Alabama Zoning Ordinance.
I.
The New York State Environmental Quality Review Act is contained in ECL article 8. "In enacting ECL article 8 (L 1975, ch 612), the New York State Legislature declared a State policy to promote efforts which will prevent or eliminate damage to the environment and enhance human and community resources * * * and * * * that all regulatory agencies * * * have an obligation to protect the environment for the use and enjoyment of this and all future generations” (H.O.M.E.S. v New York State Urban Dev. Corp., 69 AD2d 222, 229 [citations omitted]).
*891 The fundamental policy of SEQRA "is to inject environmental considerations directly into governmental decision making; thus the statute mandates that '[s]ocial, economic, and environmental factors shall be considered together in reaching decisions on proposed activities’ ” (Matter of Coca Cola Bottling Co. v Board of Estimate, 72 NY2d 674, 679 [citation omitted]).
If a proposed "action” may have a significant effect upon the environment, the agency required to approve or disapprove the action must require the preparation and submission of an environmental impact statement (EIS) (H.O.M.E.S. v New York State Urban Dev. Corp., supra, at 229).
The parties agree that the rezoning of 182 acres of farm land from agricultural-residential to industrial for the purpose of permitting the operation of a quarry is a "Type I” action as defined by the regulations implementing SEQRA. There is a relatively low threshold for requiring an EIS before approving such actions because the designation of a proposed action as "Type I” "carries with it the presumption that it is likely to have a significant effect on the environment.” (Matter of Miller v City of Lockport, 210 AD2d 955, 957.) The criteria for determining "significant” are set forth in 6 NYCRR 617.7 (c) (1) and list "indicators of significant adverse impacts on the environment [including]:
"(i) a substantial adverse change in existing air quality, ground or surface water quality or quantity, traffic or noise levels * * * a substantial increase in potential for erosion, flooding, leaching or drainage problems;
"(ii) the removal or destruction of large quantities of fauna * * *
"(viii) a substantial change in the use, or intensity of use, of land including agricultural * * *
"(xi) changes in two or more elements of the environment, no one of which has a significant impact on the environment, but when considered together result in a substantial adverse impact on the environment”.
In order to assist in the determination as to whether a proposed Type I action is significant, the agency and the applicant are required to prepare a full environmental assessment form (EAF).
At the conclusion of the review process, the lead agency is to make its determination as to whether the proposed action may have a significant impact upon the environment. A "Positive Declaration” will require the preparation of an EIS while a *892 "Negative Declaration” is a "determination of nonsignificance” and will not. A Negative Declaration means that the lead agency has determined that the proposed action "will not result in any significant adverse environmental impacts.” (6 NYCRR 617.2 [y].)
An agency’s determination is subject to judicial review: "A court’s authority to examine a SEQRA review * * * is limited to reviewing whether the determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion. The relevant question before the court is 'whether the agency identified the relevant areas of environmental concern, took a "hard look” at them, and made a "reasoned elaboration” of the basis for its determination’ ” (Matter of Gernatt Asphalt Prods. v Town of Sardinia, 87 NY2d 668, 688 [citation omitted]).
II. HISTORY OF THE CASE
Respondent Lancaster Stone Products Corporation (Lancaster Stone) entered into a purchase contract for 182 acres of farm land, the sale being contingent upon respondent Town of Alabama rezoning the property to an industrial classification so that a quarry could be operated on the site. Lancaster Stone requested that the site be rezoned from agricultural-residential to industrial. For the past 25 years, Lancaster Stone has also operated an existing quarry which is located approximately 1,000 feet from the site sought to be rezoned.
In January 1997, Lancaster Stone sent the Alabama Town Board an environmental assessment form. The EAF contains three parts, the first of which is to be completed by the applicant, i.e., Lancaster Stone, and the others to be completed by the Town Board as lead agency. Lancaster Stone completed all three parts of the EAF and advised the Town Board that it had done so "in an effort to assist the Town Board.”
On March 10, 1997 the Town Board voted to adopt the findings and conclusions contained in the EAF, a portion of which had been amended via additions from the original form completed and submitted by Lancaster Stone. The Board directed the Supervisor to file a "Negative Declaration” and adopted a resolution to rezone the 182 acres from agricultural-residential to industrial.
The petitioners, Wayne, Bryan and Dennis Phelps, own a family farm, the western boundary of which abuts the quarry presently operated by Lancaster Stone. The rezoned 182-acre site of the proposed new quarry is approximately 1,000 feet to *893 the east of the existing quarry. The Phelps’ farm and residences are located between the two sites. The Phelps commenced this action seeking a judgment under CPLR article 78 and declaratory relief pursuant to CPLR 3001.
Petitioners claim that the Town Board as lead agency failed to adhere to the standards under SEQRA and committed various other errors in approving Lancaster Stone’s petition for rezoning. Respondents allege that the Town Board’s issuance of a Negative Declaration and subsequent approval of the petition for rezoning was proper in all respects and further claim that petitioners’ challenge to the rezoning action was not timely commenced. They also urge that since the proposed action to rezone was for the purpose of operating a quarry, the Mined Land Reclamation Law would be applicable.
Respondents assert that in making its determination of "non-significance” and thus not requiring the preparation of an EIS, the Town Board took into consideration the fact that the quarry could not be operated without obtaining a permit from the Department of Environmental Conservation (DEC) and that the DEC is required to address areas of potential environmental impact before issuance of the permit. Respondents further argue that only the State can regulate mining and that the Town Board recognized that limitation on its authority in considering the rezoning petition.
Petitioners respond that the MLRL specifically reserves the enactment and enforcement of zoning ordinances to local government and that therefore the MLRL does not diminish the Town Board’s obligation to comply with SEQRA. Petitioners also submit that their challenge to the rezoning was commenced within the applicable Statute of Limitations.
Within this context, the court turns its attention to the review process conducted by the Alabama Town Board.
III.
A. Identification of the Relevant Areas of Environmental Concern
The lead agency has the responsibility of determining whether a project or action may be significant. In order to do so, it must first identify relevant areas of environmental concern. A review of the minutes of the Town Planning Board meetings indicates that truck traffic, wetlands, the percentage of property that would be utilized for the quarry, air quality and groundwater were all topics which were discussed.
*894 On January 16, 1997, Lancaster Stone sent the Town Board the environmental assessment form "to comply with the requirements of SEQRA” (letter from Lancaster Stone to Town of Alabama, Jan. 16, 1997).
Part 2 of the form is entitled "Project Impacts And Their Magnitude” and is the "responsibility” of the lead agency. Part 2 assists the agency in determining those areas of the environment that may be affected by the proposed action and the extent of the impact upon the particular area. As such, it necessarily identifies relevant areas of environmental concern.
Part 2 was completed by Lancaster Stone and submitted to the Town Board. As submitted, Lancaster Stone identified the following areas of the environment that may be affected by the proposed action: wetlands, the land itself, groundwater, air quality, agricultural land resources, noise and odors. Lancaster Stone also completed that portion of part 2 wherein the extent of the potential environmental impact is assessed for each area identified.
At its meeting of March 10, 1997, the Town Board discussed the possibility of property owners having "problems with their wells” and suggested that the Planning Board "be made aware of the transportation impact” so that it could be addressed before Lancaster Stone was issued a special use permit. The Board passed a resolution stating in applicable part that it had considered all of the information in the environmental assessment form and authorized the Town Supervisor to file the Negative Declaration.
The court’s review of the Town Board and Town Planning Board meetings leads it to conclude that the Town Board, as lead agency, did identify relevant areas of environmental concerns.
B. "Hard Look” at the Identified Relevant Areas of Environmental Concern
Representatives of Lancaster Stone addressed the Planning Board members at two meetings. At neither meeting does there appear to have been an analysis of the environmental impact that the Lancaster Stone proposal would have on the 182-acre site. The Lancaster Stone representatives advised the Planning Board of the "permit process”, an obvious reference to the permit that must be obtained from the DEC to operate a quarry. While each representative addressed the potential impact that the project may have upon the well and water supplies of the surrounding landowners, there is no evidence of *895 anything more than a cursory discussion of other relevant areas of environmental concern. It appears that the. only person who appeared before the Planning Board with any environmental expertise whatsoever was a geologist employed by Lancaster Stone.
After the Planning Board had recommended against rezoning, the Town Board addressed the application at its meeting of March 10, 1997. The minutes of that meeting state: "Be it resolved that the Town Board adopts the findings and conclusions relating to the probable environmental impacts contained within the Environmental Assessment Form and Negative Declaration as amended and authorizes the Town Supervisor to execute the same and to file the Negative Declaration in accordance with the applicable provisions of law”.
Therefore, as of March 10,1997, the Town Board had reached the conclusion that an environmental impact study was not necessary. The Town Board adopted the "findings and conclusions relating to the probable environmental impacts contained within the Environmental Assessment Form” prepared almost in toto by the applicant. There is nothing in the record which indicates any attempt on the part of the Town Board to independently assess the conclusions set forth by the applicant in part 2 of the EAF as to the designation of potential environmental impact, its extent, and the possibility of the impact being mitigated. This was not done despite the fact that the preparation of part 2 is the responsibility of the lead agency.
The same can be said of part 3 of the EAF wherein the lead agency is to evaluate the importance of the identified environmental impacts. This was also filled out by Lancaster Stone and accepted by the Town Board with two amendments, one of which simply addresses a possible liability issue relative to the potential impact the quarry may have upon the wells of adjacent landowners, and the second reaching the unsupported conclusion that since there has been no major environmental impact with the existing quarry, it can be assumed the same will be true with the proposed quarry.
At oral argument respondents acknowledged that no EIS was ever done on the existing quarry to the best of their knowledge, but that the quarry is regulated by the DEC under the MLRL. The inferences sought to be drawn are that the DEC monitoring insures compliance with environmental regulations; that the original quarry is operating and therefore must be in compliance; and finally, because the new site is "approximately 1,000 feet” away, the operation of the new quarry *896 would not have a significant impact on the environment because the proposed site necessarily has the same environmental characteristics as the first site.
First, there is nothing in the record to demonstrate what the DEC’s experience has been with the original quarry, assuming relevance.
Second, all concede that the operation of a quarry on the 182-acre site is a Type I action. While prior experience with a nearby site may give the lead agency indications as to which potential impact may be worthy of greater or lesser consideration, to simply accept the conclusion in a Type I action that based upon inferences from experience with an existing site that the proposed action will not have a significant impact on the environment is arbitrary and capricious and violates the letter and spirit of SEQRA.
After comparing the existing quarry to the proposed quarry, the second amendment in part 3 of the EAF goes on to say: "It is also noted that before any quarry operation can actually begin at the new location, the operation is required to obtain a permit from the United States Corps of Engineers and from the New York State Department of Environmental Conservation, which agencies are expected to impose any reasonable conditions required for avoiding or mitigating any significant environmental impact of the quarry operation.” (EAF part 3; emphasis supplied.)
The Town Board’s apparent reliance upon other agencies to impose conditions for "avoiding or mitigating any significant environmental impact of the quarry operation” is misplaced. If a Type I action may have a significant environmental impact, then the remedy as required by SEQRA is not to rely upon other agencies "to impose reasonable conditions” but rather for the lead agency to issue a Positive Declaration and require an EIS. SEQRA does not permit a lead agency to delegate its responsibilities to other agencies. (See, Matter of Coca Cola Bottling Co. v Board of Estimate, 72 NY2d, supra, at 682-683.)
Respondents urge the court to consider that with the enactment of the MLRL, the New York State Legislature severely limited local government’s authority to impose conditions and address the environmental impacts affecting mining operations. The parties agree that the MLRL would be applicable to a quarry operation. However, while only the State can regulate mining activity, the MLRL specifically reserves the enactment and enforcement of zoning ordinances to local government. (See, Matter of Gernatt Asphalt Prods. v Town of Sardinia, 87 NY2d 668, 681, supra.)
*897 Mining may not be conducted unless a permit has been obtained from the DEC. The DEC has the power and duty "to establish environmental standards and criteria for mining” (ECL 23-2709 [1] [c]). In order to obtain a permit the applicant must submit a mined land use plan which shall include measures to be taken by the applicant to minimize adverse environmental impacts resulting from the mining operation. The DEC may accept a draft environmental impact statement prepared pursuant to SEQRA in lieu of the mined land use plan.
Respondents argue that since the Town Board knew that the DEC had primary authority over the regulation of mining activity and since the Board further knew that the DEC would review the environmental impact of any proposed mining operation, it was not necessary, even in a Type I action, to require an EIS. Essentially, respondents argue that any environmental concerns will be addressed by the DEC at the permit stage subsequent to the rezoning being approved.
Respondents point to no statutory authority or case law which absolves a lead agency of its obligations under SEQRA simply because the DEC will address environmental concerns later in the process. The fact that approvals are necessary from other agencies before commencement of the mining operation does not relieve the Town Board of its obligation to comply with SEQRA. (See, Matter of Young v Board of Trustees, 221 AD2d 975, 976, affd 89 NY2d 846.)
The court concludes that rather than taking a "hard look” at identified relevant areas of environmental concern as to the proposed site, the Town Board simply accepted Lancaster Stone’s evaluation of the magnitude of potential environmental impacts and its evaluation of the importance of those impacts. It then impermissibly delegated its responsibility to take a "hard look” to third-party agencies who would be involved in the anticipated permit process.
C. "Reasoned Elaboration” of the Town Board’s Determination
Petitioners urge that the Town of Alabama did not provide a "reasoned elaboration” for the determination set forth in its Negative Declaration that the proposed action would not have a significant impact upon the environment. In making its determination of significance for a Type I action, the lead agency must "set forth its determination of significance in a written form containing a reasoned elaboration and providing reference to any supporting documentation.” (6 NYCRR 617.7 [b] *898 [4].) Here, the Town Board’s Negative Declaration necessarily-meant either that the proposed rezoning and quarry would generate no adverse environmental impacts or that the identified adverse environmental impacts would not be significant. Its reasons which support this conclusion are referenced on the back of the Negative Declaration form wherein it simply states: "As stated in the Environmental Assessment Form adopted by the Town Board”.
The record indicates that the Town Board adopted the EAF as submitted by Lancaster Stone with two additions. The first required the Town Planning Board to consider compensation to the owners of any well whose use is affected by the quarry as a condition precedent to the issuance of a special use permit. The second, a paragraph entitled "Impact on Growth and Character of Community or Neighborhood” at the end of part 3 of the EAF, references the Town’s experience with the existing quarry. Exactly what experience the Town may have had with the existing quarry which allowed it to conclude that: "The experience shows that there has been no major environmental impact from the operation of the existing quarry,” is unknown. It further states: "There is no reason to believe that the operation of a similar quarry at the new location will have larger environmental impact.” These conclusory statements, without factual basis, are hardly sufficient to demonstrate a "reasoned elaboration” for the issuance of the Negative Declaration.
The Town Board did not provide a "reasoned elaboration” for its determination that the proposed action would not have a significant adverse impact upon the environment. Their failure to do so was arbitrary and capricious.
IV. STATUTE OF LIMITATIONS
Respondent Lancaster Stone alleges that petitioners’ challenge to the rezoning action is untimely. It acknowledges that generally there is a four-month period in which to initiate a proceeding against a body or officer "after the determination to be reviewed becomes final and binding” (CPLR 217 [1]). However, it urges that Town Law § 267-c mandates that a challenge to a rezoning decision must be interposed within 30 days and thus constitutes "a shorter time * * * provided in the law authorizing the proceeding” (CPLR 217 [1]).
The parties do not dispute that petitioners’ article 78 proceeding was instituted within four months of the Alabama Town Board’s meeting of April 14, 1997 at which it passed the *899 resolution amending the Town Zoning map changing the disputed 182-acre site from agricultural-residential to industrial. Petitioners allege that the rezoning was invalid due to respondent’s failure to comply with the letter and spirit of SEQRA. The applicable time within which such a claim must be raised was addressed in Matter of Save the Pine Bush v City of Albany (70 NY2d 193, 200), wherein the Court held: "that a proceeding alleging SEQRA violations in the enactment of legislation must be commenced within four months of the date of enactment of the ordinance.”
Therefore, petitioners’ claim was commenced in a timely fashion. In light of the court’s decision set forth herein, respondent Lancaster Stone’s allegation as to the untimeliness of petitioners’ other claims need not be addressed.
V.
The court having found that respondent Town Board of the Town of Alabama failed to comply with SEQRA in that its action in issuing a "Negative Declaration” was arbitrary and capricious, the additional claims alleged by petitioners need not be reached.
Therefore, after careful consideration of all issues, it is ordered, adjudged and decreed that respondent Town Board of the Town of Alabama’s determination to rezone the 182 acres in question is declared invalid for failure to comply with the State Environmental Quality Review Act, and it is further ordered, adjudged and decreed that the Town Board’s filing of a Negative Declaration under the State Environmental Quality Review Act is rescinded and nullified, and it is further ordered, adjudged and decreed that respondent Town Board is ordered to fully comply with the requirements of the State Environmental Quality Review Act prior to approval or disapproval of any future application to rezone the 182-acre site.
[Portions of opinion omitted for purposes of publication.]